James Paul DOHERTY, Plaintiff,

v.

SOUTHERN COLLEGE OF OPTOMETRY, Defendant.

No. 82–2881 GA.

United States District Court, W.D. Tennessee, W.D.

April 28, 1987.

Gail O. Mathes, Memphis, Tenn., for plaintiff.

Leo Bearman, Jr., Memphis, Tenn., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

In this action plaintiff James Paul Doherty originally asserted claims against several defendants under Section 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794, under 42 U.S.C. § 1983 and under state law. The § 1983 claim was dismissed prior to trial. In a single trial the state law claims were tried before a jury, and the handicap discrimination claim was tried before the court. The jury returned a verdict of $225,000 for plaintiff on the state law claim. The court now makes the following findings of fact and conclusions of law with respect to the handicap discrimination claim, in which Southern College of Optometry is the only defendant.

## I. FINDINGS OF FACT

### A. *Plaintiff's Personal Background and Handicap.*

Plaintiff, who was 36 years old at the time of trial, has retinitis pigmentosa. Retinitis pigmentosa is an eye disease that results in the loss of peripheral vision and also causes a loss of sight in reduced light. Thus, in layman's language retinitis pigmentosa results in tunnel vision and night blindness. Plaintiff's visual fields are restricted to a minimal field of 6° in his right eye and 10° in his left eye.

Plaintiff also suffers from an undiagnosed neurological condition associated with his retinitis pigmentosa. A 1967 evaluation of plaintiff by the Clinical Center of the National Institute of Health revealed that plaintiff suffers from a "neurologic disease manifest by peripheral sensory neuropathy, minimal motor abnormalities and cerebellar signs." Plaintiff's neurological condition affects his motor skills as well as his sense of touch and his manual coordination. He has more difficulty than the average person in using dials and also has difficulty in walking due to the neurological condition and his visual limitations. The neuromuscular problem prevents plaintiff from feeling pressure, pain or vibration in his fingertips.

Although plaintiff had originally planned to be an optometrist, as his father and grandfather had been, he did not pursue an optometry career after high school due to his visual and neurological problems. Instead, plaintiff enrolled as a student at the University of Mississippi. He received a B.A.E. degree in social studies in 1971 and an M.S.S. degree in history in 1972, both from that school. Plaintiff then taught in a private school. After leaving the school plaintiff had difficulty finding suitable employment.

### B. *Plaintiff's Application and Enrollment at Southern College of Optometry.*

Southern College of Optometry (SCO) is a not-for-profit institution that received federal financial assistance in the form of grants between 1977 and 1982. The federal funds were used in a variety of programs, including the clinical program.

In 1975 plaintiff first sought admission to SCO. He was placed on stand-by status. In 1976 plaintiff applied again with the same result.

On January 5, 1977, prior to his third admission application, plaintiff was examined by SCO faculty members Drs. Robert W. Ebbers, Denson Smith and Vasa at SCO's clinic. This examination was conducted at the request of Phyllis Dale, a counselor for the Rehabilitation for the Blind Division of the Tennessee Department of Human Services who was working with plaintiff. The express purpose of the examination was to ascertain whether plaintiff was able to perform the requirements of the optometry program and, what, if any, employment opportunities would be available to plaintiff after graduation. The examination lasted for several hours. During the course of the examination plaintiff told Ebbers and others at the SCO Clinic that he was planning to attend SCO. Although the examination was for the purpose of assessing vision problems, Ebbers testified that during this examination he had an opportunity to observe plaintiff's movements.

Plaintiff's medical and health records for the prior ten years were made available to the clinic personnel at SCO in January 1977. In particular, the 1967 report of the National Institute of Health was provided to Ebbers. The report sets out in detail plaintiff's neurological and visual problems. Ebbers testified that he read this report thoroughly. Further, the SCO clinic staff was aware of retinitis pigmentosa and "all of its implications."

After examining plaintiff and reviewing plaintiff's medical records, Ebbers wrote to Phyllis Dale on January 12, 1977, advising that plaintiff's "ability to overcome his field constriction by eye movements, combined with his academic record, and his motivation, all indicate that visually he should be able to handle any academic endeavor he attempts." Moreover, Ebbers stated, "[t]he stability of his condition should persist and should not interfere with completion of his studies or continuation of his chosen profession."

About this same time plaintiff was given a general physical examination by Dr. Nicholas Gotten, Jr. On January 13, 1977, Gotten wrote to Phyllis Dale indicating that plaintiff has an "undiagnosed neurological condition, stable." Gotten further stated that plaintiff was unsuited for certain vocations that required coordination and sensory input. Gotten doubted that plaintiff could be an optometrist, but felt he should be allowed to try. This letter was not furnished to SCO.

On February 1, 1977, Phyllis Dale met with Ebbers and Vasa to discuss SCO's evaluation of plaintiff for a vocation in the field of optometry. Both doctors indicated to her that at first they had been pessimistic about plaintiff's ability to succeed in optometry. They told her, however, that after examining him and reviewing the medical records, they believed that plaintiff's condition appeared stable, that the possibilities for plaintiff in optometry were promising, and that plaintiff should be able to practice optometry without restriction. Moreover, Ebbers and Vasa advised Dale that even if plaintiff's condition should deteriorate, he would still have employment opportunities in teaching, supervising others in training, or in operating an optometric business. Based on the assurances and statements of Ebbers and Vasa, Dale recommended that the Rehabilitation for the Blind Division of the Department of Human Services support plaintiff in optometry school.[1]

---

1. The State of Tennessee provided tuition support and reader services for plaintiff while he was a student at SCO.

On November 28, 1977, with Dale's assistance, plaintiff sought admission for the third time to the four-year optometry program at SCO. Plaintiff's application stated on line 10: "Physical Handicaps: Retinitis pigmentosa."

Plaintiff was accepted into the O.D. program at SCO for the academic year beginning in the fall of 1978. Subsequent to his acceptance a Dr. James W. Day completed a physical examination form for plaintiff which was submitted to SCO. The form did not indicate plaintiff's handicaps.[2]

Plaintiff entered SCO in the fall of 1978, and successfully completed more than three years of the four year O.D. program. At the end of the summer quarter in 1981, which was the beginning of his final year at SCO, plaintiff was a senior in good standing, with a grade point of 2.41 of a possible 4.00. He had completed the same course of study as others in his class at that time and had done so without any special accomodations by SCO.

During this three year period, plaintiff participated in volunteer clinical projects sponsored by the Lions Clubs in Guatamala, Costa Rica and Belize, examined and worked with patients, and performed successfully in the SCO clinic. Dr. Thomas Stander, a classmate of plaintiff, testified that he had traveled to Central America with plaintiff on four occasions, that plaintiff actively participated in patient care, and that on one trip he and plaintiff took charge of the trip.

### C. Plaintiff's Failure to Pass Clinical Proficiency Requirements.

During plaintiff's second year at SCO, in response to changes in state laws permit-

ting optometrists to use diagnostic drugs to diagnose eye pathology, the school changed its graduation requirements to make its existing externship program mandatory for all students. In addition, it added clinical proficiency requirements which had to be satisfied prior to entering the mandatory externship program, including a requirement that students demonstrate proficiency on various instruments used in the pathology clinic. The externship and clinical proficiency requirements were made applicable to all students enrolled at that time.[3]

In the spring of 1981, plaintiff experienced difficulty using certain instruments in the pathology clinic. Dr. Denson Smith, Chief of the Pathology Clinic, was advised of plaintiff's difficulties in May 1981. Smith observed plaintiff in the pathology clinic and concluded in July 1981 that it would be hazardous for plaintiff to perform any techniques in the pathology clinic that would involve physical contact with patients. Smith was of the opinion that plaintiff did not have the necessary "eye sight" or the "coordination and sensitivity in his fingers" to perform with the instruments in the pathology clinic. After this point Smith prohibited plaintiff from touching patients in the pathology clinic and restricted plaintiff's activities to taking case history and evaluating data. Plaintiff was permitted to continue working with patients in SCO's other specialty clinics, including the contact lens clinic.

On September 11, 1981, Dr. John Levene, SCO Dean of Faculty, wrote to SCO President Spurgeon B. Eure, stating: "In view of his tremendous handicaps, [plaintiff] is

---

**2.** In this court's judgment, the facts relating to plaintiff's admission to SCO and SCO's pre-admission knowledge of his handicap are not relevant to the handicap discrimination claim. These facts were extremely important with respect to plaintiff's state law claim, however. Because plaintiff argues that they are also relevant to the handicap discrimination claim, this court includes factual findings on these subjects here.

**3.** Joyce Bell Kay, a former admissions officer at SCO, testified that, as a general rule, a student would be required to complete the requirements

of the catalog under which he or she had entered. Ms. Kay noted particularly that when the O.D. program was changed from a 3 to 4 year program, students already in school were allowed to graduate under the 3 year program. Dr. Vonne Porter, SCO Executive Vice President, testified, however, that certain curriculum changes were made in 1968–69 and 1975–76 which were, like the clinical proficiency requirements, applied retroactively to students in school at the time of the change. Thus, it appears that some changes were applied retroactively while others were not.

to be commended for the tremendous effort that he has put out and what he has achieved so far academically.... He obviously must realize that he can never practice optometry as a "normal" clinical practitioner." Levene proposed awarding plaintiff an honorary degree.[4]

As of October 31, 1981, sixty-three percent of plaintiff's class had taken and passed the pathology clinic proficiency examination.

On November 3, 1981, Levene wrote to the then Assistant Director of Clinical Programs, Dr. Wylie Tirey, stating:

I cannot help feeling that in view of Dr. Smith's comments and memoranda referring to St. Dr. Doherty's handicaps leading to poor performance, that you should request the student to have his competency examination at the earliest opportunity. I can see nothing to be gained by prolonging it.

On November 4, 1981, Tirey sent a memorandum to plaintiff which stated:

Dr. Smith and the other members of the Pathology Clinic Staff have reported to me that they feel that because of your lack of fine motor control and your visual problems that you will be unable to pass the Pathology Clinic's Competency Test. Since passage of this competency test is a requirement for participation in our externship program and since participation in an approved externship is a requirement for graduation, I feel that it would be in everyone's best interest for you to take the Pathology Clinic's Competency Test as soon as possible.

Please contact Dr. Smith within the next week to set up a time for taking this test.

Plaintiff received this memorandum some time after November 4 and met with Smith on November 10. At the meeting plaintiff asked Smith for two weeks to practice for his pathology check-out, but Smith only gave him one week. The pathology check-out was scheduled for November 18, 1981.

On November 18, 1981, Smith administered to plaintiff what was scheduled to be the required check-out on all pathology procedures. During the pathology check-out plaintiff successfully performed on two instruments. When plaintiff attempted to perform with the Zeiss 4–mirror gonioscope, however, he put excessive force on the eyeball and was unable to perform with the instrument. Smith then terminated the check-out exam, determining that there was too great a risk of injury to the patient if plaintiff was allowed to proceed. Because he felt the use of the Goldmann 3–mirror gonioscope and the binocular indirect opthalmoscope was even more difficult, Smith saw no reason to permit plaintiff to attempt to check out on these instruments. Plaintiff was given a failing grade in the pathology clinic check-out examination.

Smith detailed the results of plaintiff's check-out exam in a memo dated November 18, 1981. He stated:

My opinion today is the same as it was stated in my memo of July 2, 1981. He does not possess the fine muscle coordination and eyesight necessary to do the techniques successfully and with a reasonable amount of safety to a patient. In the future, he will be allowed only to observe and, as he must be graded as other students, will be given a grade of zero.

Plaintiff successfully passed all of the other clinic check-outs required for participating in the mandatory externship program, including vision training, electrodiagnostics, dispensing, contact lens, and general clinic. It is undisputed that plaintiff only lacked demonstration of mechanical proficiency on four instruments in pathology clinic and his externship to complete the requirements for graduation. These four instruments were the Zeiss 4–mirror gonioscope, the Goldmann 3–mirror gonioscope, the binocular indirect ophthalmoscope, and the Schiotz tonometer.

Plaintiff requested a waiver of the pathology clinic proficiency check-out requirements. This request was considered by the

4. Levene later wrote to Eure retracting the recommendation that plaintiff be offered an honorary degree.

SCO Admissions and Examinations Committee and denied. The Admissions Committee did recommend that plaintiff be awarded an honorary degree.

Plaintiff sought further review of the Admissions Committee decision before the Executive Committee of the Board of Trustees and, ultimately, the Board of Trustees itself. Plaintiff's request for a waiver was denied at all levels, but the Board of Trustees decided in March 1982 that plaintiff should be given an additional quarter to practice with the pathology instruments in question and then be re-examined. Prior to this decision both Levene and Smith had stated that they felt there was no hope plaintiff could pass a retest. Plaintiff agreed to practice and attempt the pathology check-out a second time.

As a prerequisite to any practice by the plaintiff, SCO required any volunteer "patients" for plaintiff's practice sessions to sign a release. The release was intended to protect both SCO and the plaintiff. The release provided in part:

> It is my desire to have a necessary optometric examination at the Southern College of Optometry.
>
> I understand that the person to perform such examination has a possible deficiency of fine muscle coordination and appropriate eyesight, but he is otherwise qualified as an optometric student.
>
> . . . .

Plaintiff practiced the various pathology procedures diligently during the spring quarter of 1982. He was assisted in his practice by SCO faculty member Dr. James Burke. On June 2, 1982, plaintiff was given a second pathology check-out exam. This exam was conducted by three SCO professors: Burke, Dr. Fred R. Burnett and Dr. Jim M. Newman, III. Levene was also present. At plaintiff's request Smith was not a part of the check-out committee.

On June 3, 1982, Eure wrote to plaintiff advising him that he had failed the second pathology check-out and that, since he would be unable to complete the degree requirements, his enrollment in the Doctor of Optometry Program was terminated.

The procedure used for plaintiff's check-out differed from that utilized for other students. Students were required to pass the clinical check-outs before beginning their mandatory externships. They generally could select the instructor with whom they wanted to check out and the time for the check-out. They could test on one instrument at a time or on a block of instruments. If a student failed a particular instrument, retesting was allowed. Some students were passed without actually performing on all instruments.

Plaintiff's externship was scheduled for the spring of 1982; thus he was tested on the instruments prior to the time scheduled for his externship.

Plaintiff testified that he was humiliated by the process utilized by SCO preceding his termination and that he was depressed by the school's decision. This testimony was corroborated by plaintiff's brother, Bill Doherty.

Shortly after plaintiff's termination from the O.D. program, on June 16, 1982, Levene replied to a memo from Eure detailing plaintiff's assertions that he had been treated unfairly. Levene's reply included the following:

> Not only does James Doherty have severe handicaps (blindness and poor neuromotor control, etc.) but in genuinely believing that he is equal to the average student in his class he has a vivid imagination exhibiting wishful thinking, that perhaps too borders on the pathological.

Plaintiff concedes that because of his visual and neurological handicaps he is unable to pass an examination on the four instruments in question. Plaintiff has all technical knowledge necessary for use of the instruments; his only deficiency in using them results from his inability to manipulate them properly. Because of his handicaps, plaintiff is unable to determine how much pressure he is exerting on the eyeball. Thus, he cannot use the instruments without danger to the patient.

### D. Uses of the Four Instruments and Basis for the Proficiency Requirement.

The four instruments with which plaintiff was unable to demonstrate mechanical

proficiency are used to evaluate the pathology of the human eye. Each routinely requires the use of diagnostic drugs.

The Zeiss 4–mirror, the Goldmann 3–mirror and the Shiotz tonometer are all diagnostic instruments used by placing them directly upon the cornea of the patient. They are used in conjunction with a slit lamp to examine the inner portions of the eye for potential symptoms of glaucoma, torn retinas, holes in retinas, and other problems. Too much pressure exerted by the optometrist on the patient's cornea with these instruments can cause corneal injury and misdiagnosis. The indirect binocular opthalmoscope is used in low lighting for the purpose of examining in three dimensions the interior aspects of the patient's eyes for retinal tears and other eye pathology.

Much expert testimony was presented about the extent to which these instruments are used by private practitioners and the necessity for an academic requirement of proficiency in them.

The proof established that in the past ten years there have been considerable changes in state laws relating to use of diagnostic drugs by optometrists. Ten years ago approximately three to five states allowed optometrists to use such diagnostic drugs; at the time of trial forty-three states allowed diagnostic drugs to be used by optometrists, and three other states allowed use of therapeutic drugs. Because the four instruments in issue require use of diagnostic drugs, they were not generally taught in optometry schools ten years ago.

The four instruments on which plaintiff could not demonstrate proficiency are extremely valuable tools in the diagnosis of eye pathology. While some of plaintiff's witnesses who are optometrists asserted that they did not use the instruments or that they used them with varying degrees of regularity, all plaintiff's witnesses admitted the importance of the instruments as diagnostic tools in determining eye pathology. All plaintiff's witnesses asserted that the demonstration of proficiency in the use of such instruments as an academic requirement was in fact reasonable and desireable. Defendants' witnesses, Drs. Larry Alexander[5] and Spurgeon Eure, both Doctors of Optometry and both involved in the optometric academic process, went further and specifically asserted that the demonstration in proficiency in the use of the instruments involved was essential to the program of instruction in a school of optometry. Dr. Alexander stated that the use of such instruments was "the standard of care" for present-day practicing optometrists and a necessary part of a general optometry exam.

Ebbers, who was on the Admissions Committee which heard plaintiff's appeal, testified that he voted against a waiver of the requirements because they were important and necessary.

Despite the proof that the requirement of proficiency in the four instruments is reasonable or essential, there is considerable proof that many optometrists do not use them regularly in their practices or know how to use them.

Plaintiff's expert Dr. John Mohr, who has been in the general practice of optometry in Mississippi for over twenty years, testified that he does not use any of these four instruments and they are seldom used by optometrists in Mississippi. He feels the Schiotz tonometer is obsolete and inaccurate and the indirect opthalmoscope is unnecessary in the general practice of optometry. He does not use either the 4–mirror or 3–mirror gonioscope as their primary purpose is the further evaluation of glaucoma, which he cannot treat under Mississippi law. He believes that an optometrist can practice to the acceptable level medical standards without the use of any of these instruments.

Another of plaintiff's witnesses, Dr. Raymond John Homer, a former professor at SCO and one of plaintiff's former instructors in the general clinic, testified that he

**5.** Dr. Alexander is professor of optometry at the University of Alabama at Birmingham School of Optometry.

has not used these instruments in his practice of optometry in Texas. In Texas optometrists cannot use diagnostic drugs and, therefore, the use of these instruments by a practicing optometrist is illegal. Dr. Homer further testified that these instruments were used primarily by "ophthalmologists or some type of eye or retinal specialist, other than a general practicing optometrist."

Dr. Steve Thomas, a classmate of plaintiff who now practices optometry in Colorado, testified that these four instruments play a "minimal role" in his practice of optometry, that these instruments are not used in routine patient care and are only used with patients who require additional evaluation of potential pathology problems. Dr. Tom Stander, another classmate of plaintiff who now practices optometry in Arizona, testified that he has used the Zeiss 4-mirror three or four times since his graduation from optometry school, that he has never used the Goldmann 3-mirror and that he has only used the Schiotz tonometer on trips to Central America. He does use the indirect opthalmoscope because he treats a population with high diabetes potential. Stander testified that an optometrist can practice without the use of any of these instruments.

Ebbers testified on cross-examination that an optometrist could structure a practice without the use of these instruments and that, for example, in the low vision clinic he directs at SCO, low vision practice is maintained by relying upon pathology evaluations from the pathology clinic of SCO. Smith testified that an optometrist "can practice without using these instruments but that he or she would have to have someone else to do these things."

The four instruments are not used in the general eye exam at SCO or in the general clinic. Levene admitted in his deposition that all faculty members at SCO were not proficient in pathology.

Several witnesses who knew plaintiff testified that he could practice optometry successfully without use of the instruments. Plaintiff indicated that he intended to limit his practice to work in low vision and that he will not use the instruments in question but will refer out all patients suspected of eye pathology.

Witnesses for both plaintiff and defendant agree that eye pathology cannot always be determined from a history or from an examination that does not include the use of the four instruments as diagnostic tools. In addition, failure to use these instruments can result in the overlooking of eye pathology that can lead to permanent injury and even blindness. Further, the use of diagnostic drugs without first checking the "angle" with the Zeiss 4-mirror can precipitate closed angle glaucoma, which leads to blindness. Further, there was proof that an important element of low vision practice is to determine the eye pathology that causes patients' low vision.

### E. Accommodation by Other Educational Institutions.

Plaintiff presented testimony from Donna Sparger, director of handicap services at Memphis State University. Sparger testified that Memphis State waives certain degree requirements on a case by case basis as is necessary to accommodate handicap students, considering the nature of the handicap and the necessity of the requirement for the degree being sought. She gave examples of waiving a foreign language requirement for hearing impaired students and of waiving certain laboratory requirements. Finally she testified that she was aware of Dr. David Hartman, a well-known blind physician.

The evidence presented by Sparger has virtually no probative value in this case. Evidence of another educational institution's policies in situations dissimilar to the instant one contributes little to a determination of whether SCO violated the handicap discrimination law in refusing to waive the clinical proficiency requirement.

### II. CONCLUSIONS OF LAW AND LEGAL ANALYSIS

As both parties concede, the court has jurisdiction of this case under Section 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

> Section 504 provides in pertinent part:
>
> No otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program of activity receiving federal financial assistance....
>
> 29 U.S.C. § 794 (Supp.1985).

■ The courts have adopted rules concerning order and allocation of proof for handicap discrimination cases. In order to establish a *prima facie* case, plaintiff must prove that 1) he is an "otherwise qualified" handicapped person; 2) he has been excluded from participation in, denied the benefits of or discriminated against under the program solely by reason of his handicap; and 3) the relevant program or activity receives federal financial assistance. *See Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Doe v. New York University*, 666 F.2d 761, 774–75 (2d Cir.1981); *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372, 1384 (10th Cir.1981). Once plaintiff has established a *prima facie* case, defendant has the burden of producing evidence that plaintiff was not an otherwise handicapped individual or that his termination from the program was for reasons other than his handicap. *Pushkin*, 658 F.2d at 1386–87. Plaintiff retains the ultimate burden of proof in the case and must prove by a preponderance of the evidence that defendant's reasons for its action are based on misconceptions or unfounded factual conclusions and that the reasons encompass unjustified consideration of the handicap. *Id.*

The parties agree that SCO is a "program or activity receiving federal financial assistance" under Section 504 and is thus subject to the requirements of that provision. Further, plaintiff is clearly a handicapped individual under the Act. *See* Section 7(7)(B) of the Act, 29 U.S.C. § 706(7)(B).

■ Initially therefore the court must consider whether plaintiff has established that he is an otherwise qualified individual. The United States Supreme Court provided guidance for making this determination in *Davis*, 442 U.S. at 406–07, 99 S.Ct. at 2367. In *Davis* the court gave a simple definition of an otherwise qualified person:

> An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap. *Id.* at 406, 99 S.Ct. at 2367.

In the instant case plaintiff plainly does not fall within the *Davis* definition. By his own admission, he is unable to meet the clinical proficiency requirements of SCO's program. Thus, despite his knowledge of the instruments in question, he is not an otherwise qualified individual.

■ The inquiry does not end at this point, however. In *Davis* the court faced a claim arising out of a community college's refusal to admit an applicant with a serious hearing disability to its nursing program. After concluding that the district court had correctly construed the statute in finding that the applicant was not otherwise qualified, the court proceeded to consider whether the college's physical requirements for its nursing program were necessary. *Id.* at 407, 99 S.Ct. at 2367. *Cf.* 34 C.F.R. § 104.3(K)(3) (explanatory note using term "essential" rather than necessary). Thus, requirements must be necessary in order to be a proper basis for rendering a person not otherwise qualified within the meaning of the statute.

Davis' disability interfered substantially with her ability to understand speech and she could not have participated in the program's clinical aspects without close individual supervision. *Davis*, 442 U.S. at 409–10, 99 S.Ct. at 2368–69. Thus, her participation in the program would have represented a fundamental alteration in the training normally provided by the program. *Id.* at 410, 99 S.Ct. at 2369. In discussing whether the statute imposed on the college an obligation to make such a modification, the court said:

> In this case, however, it is clear that Southeastern's unwillingness to make

major adjustments in its nursing program does not constitute such discrimination. The uncontroverted testimony of several members of Southeastern's staff and faculty established that the purpose of its program was to train persons who could serve the nursing profession in all customary ways. This type of purpose, far from reflecting any animus against handicapped individuals is shared by many if not most of the institutions that train persons to render professional services. It is undisputed that respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered. *Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person.* (footnote omitted) (emphasis added) *Id.* at 413, 99 S.Ct. at 2370.

The court recognized, however, that "... *situations may arise where a refusal to modify an existing program might become unreasonable and discriminatory.*" *Id.* at 412–13, 99 S.Ct. at 2370. (emphasis added)

In view of *Davis,* the issue before this court is whether SCO's clinical proficiency check-out requirement is a necessary one— one which the educational institution has no obligation to modify substantially to accommodate plaintiff.

There was no disagreement among the expert witnesses about the reasonableness or desirability of a proficiency requirement for the four instruments in question. All felt such a requirement was reasonable and desirable. No expert said the requirement was not a necessary one; defendant's experts said that it was necessary. Plaintiff's argument that the requirement was not a necessary one is therefore not based on expert opinion that the requirement is not necessary. Rather, it is based on factual proof that established the following: 1) the requirement was imposed only a year or so before plaintiff failed to meet it; 2) many optometrists do not use these four instruments in their practices; 3) technicians can use the instruments, thus poten-

tially alleviating the need for an optometrist to use them; 4) the instruments are not used in the general clinic at SCO; and 5) optometrists cannot legally use the instruments in six states that do not permit optometrists to use diagnostic drugs.

Defendant's response that the requirement is necessary relies upon the expert opinion proof. Further, defendant points out that the diploma of an educational institution represents to the world that its recipient has a particular degree of skill and knowledge and does not pose a danger to the public. Defendant argues that plaintiff's inability to use the instruments without danger to patients is a further factor demonstrating the necessity of the requirement.

SCO's requirement that its students demonstrate clinical proficiency on the four instruments in question is a necessary one. Although these instruments were not typically used by optometrists ten years ago, their use is becoming much more common as states allow optometrists to use diagnostic drugs. Ability to use the instruments properly is essential to avoid injury to the patient. As an educational institution, SCO may set standards for its program that insure a particular level of competence in particular areas. Section 504 does not require that SCO lower or substantially change those standards to accommodate an individual whose handicap prevents him from meeting them. *Id.* at 413, 99 S.Ct. at 2370.

Plaintiff's argument that many optometrists do not use the instruments in their practices skirts the real issue. SCO may properly seek to insure that its graduates can perform without danger to the public in any professional role they choose. *See id.* at 413 n. 12, 99 S.Ct. at 2371 n. 12. Plaintiff's intention or ability to structure a practice that does not require use of the instruments is thus of little probative value with respect to the necessity of the requirement. Training in any professional field requires mastery of a variety of subject matter areas the professional may not use later. The focus must be on the basis for the requirement, not whether it is conceiva-

ble to work as an optometrist without meeting it.

Nor does the fact that the requirement was recently adopted undermine the court's finding of its necessity. Necessity must be evaluated at the time the requirement was applied to plaintiff. Given the rapidly changing situation in optometry with respect to use of diagnostic drugs, the recent adoption of the requirement did not render it unnecessary.

■ In arguing that the requirement was not necessary, plaintiff focuses on the language in *Davis*, 442 U.S. at 412–13, 99 S.Ct. at 2370, indicating that refusal to modify a program may be unreasonable or discriminatory in some circumstances. The same facts that make the requirement unnecessary, plaintiff contends, make the refusal to waive it unreasonable and discriminatory. This argument is without merit. Because SCO legitimately determined that proficiency on the four instruments was an important and necessary skill for its graduates and because plaintiff cannot use the instruments without danger to patients, it was not unreasonable or discriminatory to refuse to waive the requirements. Plaintiff contends that one factor to be considered in evaluating the reasonableness of SCO's refusal to waive its requirement is SCO's knowledge of plaintiff's handicap before plaintiff enrolled. The court disagrees. While SCO's prior knowledge of plaintiff's handicap was relevant with respect to the breach of contract claim, it is irrelevant to the instant inquiry. The reasonableness inquiry with respect to the handicap discrimination claim relates solely to the nature of the requirement, not to the particular circumstances of SCO's dealings with plaintiff.

Underlying the principal legal issue in this case is a fundamental difference between the parties as to the proper interpretation of the *Davis* case. Adopting plaintiff's view of *Davis* would involve the courts in evaluating the necessity of legitimate academic requirements of educational institutions by ascertaining whether or not a student could function in the career field for which he was prepared without using the information or skill gained in meeting a particular requirement. If a student could function in his chosen career field without having met it, the requirement would, in plaintiff's view, be unnecessary. This court interprets *Davis* differently. *Davis* affirms the principle that educational institutions do not have to lower academic requirements to accommodate handicapped persons. Its language concerning situations in which refusal to modify a program may be "unreasonable and discriminatory" speaks to situations in which a requirement has no necessary relation to the particular area in question. For example, refusal to alter a physical education requirement for a history degree would clearly be "unreasonable and discriminatory." A refusal to modify a requirement clearly related to patient safety and diagnosis of eye pathology in the practice of optometry is not unreasonable or discriminatory. A contrary holding would completely nullify *Davis'* plain statement that "Section 504 imposes no requirement on an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Id.* at 413, 99 S.Ct. at 2370.

The parties disagree about the applicable law and the proper interpretation of *Davis* in another respect. The *Davis* holding was later discussed by the United States Supreme Court in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Although *Choate* is important principally for its discussion of disparate impact handicap discrimination claims, the Court in *Choate* also assessed its analysis in *Davis*, the other major Supreme Court case interpreting Section 504. The court in *Choate* said:

> *Davis* thus struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.

The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made. (citations and footnotes omitted). 105 S.Ct. at 720–21.

*Choate* arguably characterizes the issue of whether an educational institution must modify a requirement to accommodate a handicapped individual as a "reasonable accommodation" issue—an issue separate from, but related to the determination of whether an individual is "otherwise qualified." Plaintiff apparently adopts this interpretation of *Choate* and in essence urges the court to analyze SCO's refusal to waive its requirement in terms of whether or not waiver was a reasonable accommodation of plaintiff's handicap. Defendant's position is that the two issues should not be confused and that plaintiff has not established a *prima facie* case that he is an "otherwise qualified" handicapped person. In any event, defendant contends, reasonable accommodation was made in providing plaintiff an opportunity to practice and take the check-out test again; waiver was

not required to make reasonable accommodation.

This court does not read *Choate* as undermining the simple statement in *Davis* that "an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." The reasonable accommodation inquiry is a separate issue—one which involves evaluation of a defendant's action with respect to accommodating an individual who is otherwise qualified. *See Jasany*, 755 F.2d at 1250–51. In the context of this case, however, application of the analysis urged by either party yields the same result. SCO was not unreasonable or discriminatory in refusing to waive a necessary requirement of its program. *See Davis*, 442 U.S. at 412–13, 99 S.Ct. at 2370. Nor was the refusal to waive the requirement a failure to make a reasonable accommodation; the modification resulting from the waiver would have been substantial or fundamental rather than reasonable.[6] *See Choate*, 105 S.Ct. at 720. Surely the law does not require that a handicapped person be accommodated by waiver of a requirement when his failure to meet that requirement poses potential danger to the public.

■ Because plaintiff is not an otherwise qualified handicapped person and because defendant did not fail to make a reasonable modification in its program, plaintiff's claim must fail.[7] Plaintiff has

6. Plaintiff contends that defendant bears the burden of proving that reasonable accommodation is not possible. Defendant disagrees. The issue has not been explicitly decided in the Sixth Circuit in a case involving a recipient of federal financial assistance. In *Jasany*, however, which involved a federal agency defendant, the Sixth Circuit followed the burden of proof standard with respect to reasonable accommodation set forth in *Prewitt v. United States Postal Service*, 662 F.2d 292, 308 (5th Cir.1981). *Prewitt* places the burden of persuasion on this issue on the employer. *Prewitt* also involved a federal agency defendant and the decision was based on an EEOC regulation that would not be applicable to SCO as a recipient of federal financial assistance. Assuming that the burden of proof rests with defendant on this issue, however, defendant has carried that burden.

7. Plaintiff has established that he was treated differently from other students in the testing

process because of his handicap. Arguably he also seeks damages allegedly caused by this different treatment. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 44 ("plaintiff was, because of his handicap, singled out ... for disparate (sic) treatment that destroyed plaintiff's likelihood of success in completing the program.") This different treatment in the testing process does not provide plaintiff an alternate avenue of recovery, however. The proof plainly establishes that the testing procedure had absolutely no effect on plaintiff's ability to pass the test; he concedes that he cannot pass the check-out because of his handicap and there is no claim that he could have passed if he had practiced longer or under different circumstances. Thus, the procedure caused no damage to plaintiff except perhaps mental anguish. That mental anguish cannot be a basis for recovery by plaintiff. Plaintiff's mental suffering came from his failure, the appeal process, the re-test, the circumstances of his practicing and

not established a *prima facie* case or carried his ultimate burden of proof. Judgment shall be entered for defendant on the handicap discrimination claim.

IT IS SO ORDERED.

the release required of "patients." While certainly this was not a pleasant process for plaintiff, the procedure was a legitimate and justified response by SCO to the situation. Certain memoranda of SCO officials, particularly Levene, are extremely insensitive. Plaintiff, however, was not aware of these memos while he was going through the testing procedure. They cannot be the basis of a mental anguish claim.