James Paul DOHERTY,
Plaintiff–Appellant/Cross–Appellee,

v.

SOUTHERN COLLEGE OF OPTOME-
TRY, Defendant–Appellee/
Cross–Appellant.

Nos. 87–5595, 87–5655.

United States Court of Appeals,
Sixth Circuit.

Argued June 10, 1988.

Decided Dec. 1, 1988.
Rehearing and Rehearing En Banc
Denied Feb. 3, 1989.

Sam B. Blair, Jr., Heiskell, Donelson, Bearman, Adams, Williams and Kirsch, Memphis, Tenn., Leo Bearman, Jr. (argued), for plaintiff-appellant/cross-appellee.

Gail O. Mathes (argued), Bogatin, Lawson, & Chiapella, Paul E. Prather, Armstrong, Allen, Memphis, Tenn., for defendant-appellee/cross-appellant.

Before KENNEDY and JONES, Circuit Judges, and CONTIE, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Plaintiff-appellant/cross-appellee James Doherty (plaintiff), a former student of the defendant Southern College of Optometry (SCO), appeals from the judgment of the District Court dismissing his claim under Section 504 of the Rehabilitation Act of 1973, and directing a verdict in favor of SCO on his misrepresentation claim. *Do-*

*herty v. Southern College of Optometry,* 659 F.Supp. 662 (W.D.Tenn.1987). SCO appeals from a jury verdict in favor of the plaintiff on his breach of contract claim, and alleges on appeal that the District Court erroneously instructed the jury with regard to that claim, and erred in denying SCO's motions for a mistrial and directed verdict. We affirm the dismissal of the section 504 and misrepresentation claims. We reverse the denial of a directed verdict for SCO on the breach of contract claim.

The plaintiff suffers from retinitis pigmentosa (RP) and an associated neurological condition. The RP restricts the plaintiff's visual field to a minimal field of six degrees in his right eye and ten degrees in his left eye. The neurological condition affects the plaintiff's motor skills as well as his sense of touch and his manual coordination.

The plaintiff applied for admission to SCO in 1975. Before being admitted the plaintiff was examined by SCO faculty members, Drs. Ebbers and Vasa, at the request of Ms. Phyllis Dale, a counselor for the Rehabilitation for the Blind Division of the Tennessee Department of Human Resources, at SCO's clinic. Dr. Ebbers reported that the plaintiff's RP had stabilized and that the plaintiff's "ability to overcome his field constriction by eye movements, combined with his academic record, and his motivation, all indicate that *visually* he should be able to handle any academic endeavor he attempts." (Emphasis added.) Both Drs. Ebbers and Vasa indicated that, although initially they had been pessimistic about the plaintiff's opportunities in optometry, after examining him they felt his possibilities were promising. The plaintiff was also examined by an independent internist, Dr. Gotten, who evaluated the plaintiff's neurological disorder and reported that "I think that it would be most difficult for [the plaintiff] to be an optometrist, but I certainly would not discourage him trying." Although Dr. Gotten sent the report to Ms. Dale, neither SCO nor Dr. Ebbers received this report.

In his application to SCO, the plaintiff listed "Retinitis Pigmentosa" in response to the question as to handicaps, but did not mention that he suffered from neurological problems. The plaintiff's physician's report, completed as part of the application, stated that the plaintiff did not suffer neuromuscular abnormalities. The plaintiff also failed to inform SCO of his neurological difficulties when he completed a student health record. SCO admitted the plaintiff to its four-year optometry program. He entered under the 1978–79 SCO catalog, which provided on the inside front cover that "[t]his edition of the Southern College of Optometry catalog is effective for the academic year 1978–79. Inasmuch as changes may be necessary from time to time, this catalog should not be construed as constituting a contract between the College and any person." Under SCO policy, each school year is governed by the current school year catalog. SCO does not retroactively apply additional requirements for students who have already completed the year to which the additional requirements pertain. That is, SCO does not require a fourth year student to take a first or second year course that was added by the current catalog. SCO does, however, require first and second year students to take a new course that affects the third or fourth year course requirements.

During the plaintiff's first year at SCO, the school began to require that students pass a pathology clinic proficiency requirement in order to qualify for an externship program required for fourth year students. According to the school policy, the plaintiff was subject to the new requirement. The pathology clinical proficiency examination requires the student to perform techniques with various instruments. The plaintiff stipulated at trial that he could not perform the techniques on four of the required instruments: the Zeiss 4 mirror gonioscope, the Goldman 3 mirror gonioscope, the Binocular Indirect Ophthalmoscope and the Schiotz Tonometer. After the plaintiff failed his "check-out" on these instruments, he appealed the decision to the Admissions Committee, requesting that these requirements be waived. The Committee rejected the appeal. The Board of Trustees also denied his appeal, but granted the

plaintiff an additional quarter to practice the techniques. In spite of the extra practice, the plaintiff again failed to demonstrate his proficiency with these instruments.

When SCO refused to confer a degree upon the plaintiff, he filed suit in the United States District Court for the Western District of Tennessee against SCO and two faculty members alleging both a violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982), and section 1983. 42 U.S.C. § 1983 (1982). Plaintiff also asserted pendent state law claims of breach of contract, misrepresentation, outrageous conduct, and tortious interference with contract. The District Court dismissed the section 1983 claim and the tortious interference with contract claim before trial. The remaining state law claims were tried before a jury; the District Court, however, directed a verdict in favor of all the defendants on the outrageous conduct and misrepresentation claims. The jury returned a verdict of $225,000 in favor of the plaintiff on the breach of contract claim. The District Court denied SCO's motion for a mistrial based on jury misconduct. The section 504 claim was tried by the District Court, which found in favor of SCO. The plaintiff appeals from the District Court's decision on the section 504 claim and from the directed verdict in favor of SCO on the misrepresentation claim (No. 87–5655), while SCO cross-appeals from the jury's verdict on the breach of contract claim (No. 87–5595).

I

The first issue we address is whether the District Court erred in finding for SCO on the plaintiff's claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982), which provides that *"[n]o otherwise qualified handicapped individual* in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." *Id.* (emphasis added).

The plaintiff argues that he is an "otherwise qualified handicapped individual," and that the District Court erred in finding that the plaintiff's proficiency with the four instruments was necessary to graduate. He argues that SCO used the tests as a pretext for discrimination, contending that SCO applied a higher standard to him by requiring mechanical proficiency with the instruments. SCO tested other students, he claims, based only on knowledge, and not on mechanical proficiency.

The elements of a cause of action under section 504 are as follows: (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance. *See Pushkin v. Regents of Univ. of Colorado,* 658 F.2d 1372, 1384 (10th Cir.1981); *Doe v. New York Univ.,* 666 F.2d 761, 774–75 (2d Cir.1981). *See also Southeastern Community College v. Davis,* 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). Despite agreement on the elements of a cause of action under section 504, the Courts of Appeals have been unable to agree on the proper allocation of burdens of proof in section 504 cases. *Compare Pushkin,* 658 F.2d at 1386–87 (defendant effectively bears burden of persuasion on "otherwise qualified" issue) *with Doe,* 666 F.2d at 776–77 (defendant bears only limited burden of production on "otherwise qualified" issue). *See also* Wegner, *The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap under Section 504 of the Rehabilitation Act of 1973,* 69 Cornell L.Rev. 401, 481–91 (1984); Comment, *Section 504 of the Rehabilitation Act: Analyzing Employment Discrimination Claims,* 132 U.Pa.L.Rev. 867, 891–99 (1984). We decline to comment unnecessarily upon the propriety of burden shifting in section 504 cases because the context of this case does not require us to reach the issue. Regardless of which party

bears the ultimate burden of proof on the "otherwise qualified" issue, defendant here has satisfied that burden because it has established that the clinical proficiency requirements are a necessary part of the curriculum and plaintiff has admitted that he is unable to meet these requirements.

The District Court found that the plaintiff failed to establish that he was "otherwise qualified" for participation in the program. The District Court analyzed this element as requiring the plaintiff to show that he is able to meet all of a program's *necessary* requirements in spite of his handicap. *Davis*, 442 U.S. at 406–07, 99 S.Ct. at 2367–68. Plaintiff's neurological condition indisputably prevents him from being able to use the four instruments, thus the critical question is whether proficiency with the four instruments is a necessary requirement of the program. The District Court found that it was. The court noted that all of the expert witnesses who testified felt that the requirement was reasonable and desirable, and none said that it was not necessary. *Doherty*, 659 F.Supp. at 671. The plaintiff's argument that proficiency with the instruments was unnecessary was based on proof that the requirement was imposed only a year or so before the plaintiff failed to meet it; that many optometrists do not use these four instruments in their practice; that the instruments are not used in the general clinic at SCO; and that optometrists cannot legally use the instruments in the six states that do not permit optometrists to use diagnostic drugs. Such facts, the District Court found, do not render SCO's requirement unnecessary:

> SCO's requirement that its students demonstrate clinical proficiency on the four instruments in question is a necessary one. Although these instruments were not typically used by optometrists ten years ago, their use is becoming much more common as states allow optometrists to use diagnostic drugs. Ability to use the instruments properly is essential to avoid injury to the patient. As an educational institution, SCO may set standards for its program that insure a particular level of competence in particu-

lar areas. Section 504 does not require that SCO lower or substantially change those standards to accommodate an individual whose handicap prevents him from meeting them.

*Id.* at 671 (citing *Davis*, 442 U.S. at 413, 99 S.Ct. at 2370). The plaintiff has failed to show that the District Court's finding, that the requirement is necessary, is clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985).

Plaintiff argues that *Davis* and its progeny require the court to find that the program cannot reasonably accommodate the plaintiff's handicap before the court may find that the plaintiff is not "otherwise qualified." The District Court held that the reasonable accommodation question is separate from the question of whether the plaintiff is otherwise qualified, and addressed instead the defendant's actions with respect to accommodating an individual who is otherwise qualified. *Doherty*, 659 F.Supp. at 673. The District Court went on to find, however, that either analysis yielded the same result because SCO's refusal to waive the requirement did not demonstrate a failure to reasonably accommodate the plaintiff.

In *Hall v. United States Postal Service*, 857 F.2d 1073, 1079 (6th Cir.1988) we held that the inquiry into reasonable accommodation is one aspect of the "otherwise qualified" analysis under section 504. Although the assertion in *Davis*, 442 U.S. at 413, 99 S.Ct. at 2370, that "[s]ection 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person" still holds true, subsequent cases have forced this court to reevaluate the unequivocal observation in *Davis* that "[a]n otherwise qualified person is one who is able to meet *all* of a program's requirements in spite of his handicap." *Davis*, 442 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). As the Fifth Circuit stated in *Brennan v. Stewart*, 834 F.2d 1248, 1261–62 (5th Cir.1988):

> After *Alexander* [*v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985),]

it is clear that the phrase 'otherwise qualified' has a paradoxical quality; on the one hand, it refers to a person who has the abilities or characteristics sought by the grantee; but on the other, it cannot refer only to those already capable of meeting *all* the requirements—or else no reasonable requirement could ever violate § 504, no matter how easy it would be to accommodate handicapped individuals who cannot fulfill it. This means that we can no longer take literally the assertion of *Davis* that 'an otherwise qualified person is one who is able to meet *all* of a program's requirements in spite of his handicap.' 4[4]2 U.S. at 406, 99 S.Ct. at 2367 (emphasis added). The question after *Alexander* is the rather mushy one of whether some 'reasonable accommodation' is available to satisfy the legitimate interests of both the grantee and the handicapped person. And since it is part of the 'otherwise qualified' inquiry, our precedent requires that the 'reasonable accommodation' question be decided as an issue of fact—meaning, of course, that it is one for the trial court or jury, subject to 'clearly erroneous' ... review only.

*See also School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287–88, n. 17, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987) ("[w]hen a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions").

■ While the District Court erred in treating the reasonable accommodation question as separate from the otherwise qualified analysis, the District Court was not clearly erroneous in its determination that SCO's refusal to waive the clinical proficiency requirement was not a failure to reasonably accommodate the plaintiff. Although SCO had a limited obligation to make reasonable accommodations for handicapped individuals such as plaintiff, it is clear that "[n]othing in the language or history of § 504 reflects an intention to limit the freedom of an educational institu-

tion to require reasonable physical qualifications for admission to a clinical training program." *Davis,* 442 U.S. at 414, 99 S.Ct. at 2371. An educational institution is not required to accommodate a handicapped individual by eliminating a course requirement which is reasonably necessary to proper use of the degree conferred at the end of a course of study. *See Hall,* 857 F.2d at 1079. Waiver of a necessary requirement would have been a substantial rather than merely a reasonable accommodation. *Doherty,* 659 F.Supp. at 673 ("[s]urely the law does not require that a handicapped person be accommodated by waiver of a requirement when his failure to meet the requirement poses potential danger to the public"). *Cf Copeland v. Philadelphia Police Dep't,* 840 F.2d 1139, 1148–49 (3d Cir.1988).

■ Here, too, the District Court's finding, that SCO did not fail to make a reasonable accommodation, is not clearly erroneous. SCO's elimination of the clinical proficiency requirement would not have been a reasonable accommodation. Accordingly, we affirm the District Court's dismissal of plaintiff's section 504 claim.

## II

■ The plaintiff also argues that the District Court erred in directing a verdict in favor of SCO on the plaintiff's state law misrepresentation claim. The nature of SCO's alleged misrepresentations is not entirely clear. Apparently, the plaintiff argues that Drs. Ebbers and Vasa misrepresented to Ms. Dale "plaintiff's physical ability to perform in optometry school and his employment opportunities after school." The law in Tennessee is clear, however, that an opinion cannot be the basis for a claim of misrepresentation, which requires that the defendant misrepresent a *fact. See, e.g., Edwards v. Travelers Ins.,* 563 F.2d 105, 110 (6th Cir.1977); *McElroy v. Boise Cascade Corp.,* 632 S.W.2d 127, 130 (Tenn.App.1982); *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.

App.1980).[1] The plaintiff argues that a well-settled exception exists to the rule that opinions cannot be the basis for a claim of misrepresentation, when the opinion is made by someone who holds himself or herself out as having special expertise or special knowledge relating to the subject matter of the misrepresentation, citing the Restatement (Second) of Torts § 542(a). However, the plaintiff fails to cite any Tennessee law that supports his argument. We generally defer to an experienced district judge's construction of state law, especially when as here that judge served as a state trial judge before appointment to the federal bench. *See Louisville and Jefferson County v. Travelers Ins. Co.*, 753 F.2d 533, 540 (6th Cir.1985) (quoting *Rudd–Melikian, Inc. v. Merritt*, 282 F.2d 924, 929 (6th Cir.1960)); *Clairol, Inc. v. Boston Discount Ctr. of Berkley, Inc.*, 608 F.2d 1114, 1120 n. 8 (6th Cir.1979). We, therefore, affirm the trial judge's permissible conclusion that a directed verdict should be granted as to plaintiff's misrepresentation claim.

### III

In its appeal from the jury's verdict for the plaintiff on his breach of contract claim, SCO argues first that no contract existed between the parties. Second, if a contract existed, it included SCO's right to make reasonable and necessary changes to the curriculum, and thus SCO did not breach the contract by adding the clinical proficiency requirement. Third, no proof in the record existed that SCO exercised bad faith in making curriculum changes. Fourth, damages were not proven with specificity and, because of the proof, were necessarily speculative. Last, SCO argues that no proximate causal connection was proven between the alleged breach and the alleged damages. The second and third arguments are persuasive.

SCO argues that the catalog of requirements did not create a contract, express or implied, between SCO and the plaintiff, given the language on the inside front cover of the 1978–79 catalog stating that: "this catalog should not be construed as constituting a contract between the College and any person." The plaintiff argues, however, that the relationship between a student and university is contractual in nature, and that not only do the catalogs, bulletins, circulars and regulations of the university form an express contract, but that an implied contract exists between a university and its students requiring the university to act in good faith in dealing with its students. The plaintiff argues that SCO acted in bad faith in refusing to waive the clinical proficiency requirement for plaintiff.

### A

■ Before we examine plaintiff's contractual theories under state law, we note that this case arises in an academic context where judicial intervention in any form should be undertaken only with the greatest reluctance. *See, e.g., Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (declaring federal courts unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions"). The federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum. *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–91, 98 S.Ct. 948, 954–56, 55 L.Ed.2d 124 (1978). This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession. *See Jansen v. Emory Univ.*, 440 F.Supp. 1060, 1062–63 (N.D.Ga.1977), *aff'd*, 579 F.2d 45 (5th Cir. 1978); *Olsson v. Board of Higher Educ.*, 49 N.Y.2d 408, 413, 402 N.E.2d 1150, 1153, 426 N.Y.S.2d 248, 251 (1980) ("In order for society ... to have complete confidence in the credentials dispensed by academic institutions ... the issuance of these credentials [must] be left to the sound judgment of the professional educators"). This judi-

---

**1.** Furthermore, Dr. Ebbers' opinion, by its terms, was limited solely to the plaintiff's visual limitations, and did not address his neurological limitations.

cial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course "is no less an 'academic' judgment because it involves observation of ... skills and techniques in actual conditions of practice, rather than assigning a grade to ... written answers on an essay question." *Horowitz*, 435 U.S. at 95, 98 S.Ct. at 958 (Powell, J., concurring) (footnote omitted). Against this backdrop we examine plaintiff's state law contract claims.

Since plaintiff asserts a state contract law claim, Tennessee law governs this issue. The parties, however, cite little Tennessee law defining the relationship between the university and the student. Plaintiff relies on *Bales v. Lincoln Memorial University*, slip op. (Tenn.Ct.App. Dec. 31, 1980),[2] for the proposition that the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area. *See, e.g., Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir.1984); *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir.1977), *cert. denied*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978); *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir.1976); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir.), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed. 2d 131 (1975). We are inclined to agree. Although the relationship may be analyzed as a contractual one, courts have adopted different standards of review when educators' decisions are based upon disciplinary versus academic criteria—applying a more intrusive analysis of the former and a far more deferential examination of the latter. *See, e.g., Mahavongsanan*, 529 F.2d at 449-50. The Tennessee Supreme Court has endorsed this deferential standard of review for decisions by universities based upon academic criteria. *See Horne v. Cox*, 551 S.W.2d 690, 692 (Tenn.1977) (" '[w]e know of no case which holds that colleges and universities are subject to the supervision or review of the courts in the uniform application of their academic stan-

dards' " (quoting *Mahavongsanan*, 529 F.2d at 449-50)).

The Tennessee Supreme Court has not, as far as we are able to determine, enunciated the standard which should be applied in a dispute arising out of the university-student relationship. In light of *Horne*, we believe that the Tennessee Supreme Court, in construing the terms of an implied contract between the university and the student, would adopt the deferential standard of " 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *Lyons*, 565 F.2d at 202 (quoting *Giles v. Howard Univ.*, 428 F.Supp. 603, 605 (D.D. C.1977)). Furthermore, we are of the opinion that implicit in the university's general "contract" with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious. *Mahavongsanan*, 529 F.2d at 450; *Nuttelman v. Case Western Reserve Univ.*, 560 F.Supp. 1, 3 (N.D.Ohio 1981), *aff'd*, 708 F.2d 726 (6th Cir.1982); *Jansen*, 440 F.Supp. at 1062-63; *accord Bales*, slip op. at 5 ("this Court does not intend to dictate or interfere with the formation and implementation of a private university's academic policies"). We now turn to plaintiff's three closely related contract claims.

**B**

For purposes of our analysis we divide plaintiff's contractual claims, which are not very clearly focused, into three types: first, an implied contract between plaintiff and SCO containing terms in common with all other students based on the SCO 1978–79 catalog; second, an implied contract unique to the plaintiff himself and SCO based on the representations of Drs. Ebbers and Vasa in conjunction with the SCO catalog; and, third, an implied contract of good faith and fair dealing.

In view of the disclaimer language on the inside front cover of the catalog, it is difficult to find, as plaintiff asserts, that a

---

**2.** We will assume for purposes of this appeal that the *Bales* case has precedential value. *But*

*see Swift v. Kirby*, 737 S.W.2d 271, 277 (Tenn. 1987).

binding contract was created promising the SCO class entering in 1978 the right to graduate determined under the standards in the 1978–79 catalog. The plaintiff relies on *Bales*. In that case the appellant, who had a perfect 4.0 grade point average and led his class, learned two days prior to graduation that the administration would require a student to complete a minimum of 92 credit hours at the school before he could graduate with any type of honors. This requirement was first announced to the student body at the appellant's graduation rehearsal, one day prior to the ceremony. The appellant had only 91 credit hours; the school admitted that if not for the minimum hours requirement the appellant would have graduated magna cum laude and as valedictorian. The appellant sued, alleging that the catalog under which he enrolled contractually established the exclusive criteria for graduation honors, and that no minimum hours were set out in the catalog as a requirement. The catalog specifically provided that all school policies were subject to change. Witnesses testified that the policy of requiring a certain number of credit hours had always been unwritten.

The *Bales* court found that:

Lincoln Memorial University's 1976–78 student catalog, which makes no mention of any minimum residence hours credit requirement for honors graduation, upon enrollment formed a contract with the student upon which he was entitled to rely.... Although, as previously noted, the academic policies are expressly stated to be subject to change, the provisions of a contract cannot be modified *after one side has completed performance or without giving the student a reasonable time for compliance after receipt of notification of that intended change in policy.* Mr. Bales did not receive notice of any minimum residence hours credit requirement for honors, including the original unwritten policy of 96 hours, until two days prior to his commencement ceremony, at which time he was unable to take any steps to comply with the requirement because he had completed all his courses.

Slip op. at 4 (emphasis added). Thus according to *Bales*, a contractual relationship exists between the student and the institution with respect to requirements for graduation even though the institution retains the right to change the requirements. This reservation, of the right to make changes in the terms of the contract, was subject to reasonable notice. The case at bar stands in sharp contrast to *Bales* in that the plaintiff had ample notice of the change of requirements; plaintiff does not argue that SCO failed to provide him with reasonable notice.

Applying the "reasonable expectation" standard set out in Part III A above, we believe it was reasonable for SCO, given the disclaimer printed in the front of its handbook and the practice of prospective application of curriculum changes, to expect the students to anticipate and comply with curriculum changes affecting their remaining years at the school. SCO's modification of the degree requirement to include a clinical proficiency in the four instruments was reasonable. The District Court noted even plaintiff's witnesses all stated that the requirement was in fact reasonable and desirable. *Doherty*, 659 F.Supp. at 671. No record evidence exists that SCO acted arbitrarily, capriciously or with malice. SCO simply fulfilled its educational mission by updating its degree requirements as dictated by the expanding demands of the field of optometry. *See Mahavongsanan*, 529 F.2d at 450 ("[Plaintiff's] claim of a binding, absolute unchangeable contract is particularly anomalous in the context of ... post graduate level work"). Thus, this Court should not substitute its judgment for that of the educators involved.

Plaintiff's second contractual argument is that a special contract, express or implied, existed between SCO and himself that he would be able to successfully complete the program based on the requirements as they stood in the 78–79 catalog and the evaluations of Drs. Ebbers and Vasa. Assuming, *arguendo*, that some form of implied contract could be created based upon Dr. Ebbers' assertions coupled

with the 78–79 catalog, if plaintiff is to prevail SCO would have had to impliedly agree that plaintiff would complete the program in spite of his handicap *and,* necessarily, that SCO would make no changes or additions to the program (no matter how necessary) if the effect of such changes would be to prevent plaintiff's receipt of his degree. SCO did not expressly agree to such a contract. Nor would it be reasonable for someone in plaintiff's position to so believe. Dr. Ebbers' report to Ms. Dale did not state that plaintiff *would* graduate but merely opines that his *visual* problems are not so acute as to *prohibit* him from studying at SCO. Furthermore, plaintiff himself admitted at trial that he held no belief that the college undertook to guarantee his graduation. Plaintiff's assertions that SCO impliedly agreed not to change its curriculum if the effect would be to prevent his graduation or that SCO by examining him impliedly guaranteed his ability to graduate are unfounded.

 Finally, plaintiff indirectly asserts that SCO acted in bad faith by adopting these requirements and/or by refusing to waive them upon request by plaintiff. As previously stated, all of plaintiff's witnesses stated that the new requirement was reasonable and desirable. Furthermore, no evidence was introduced nor does plaintiff himself maintain that SCO deliberately introduced the new clinical proficiency requirement to prevent plaintiff's graduation. Lastly, SCO fulfilled its obligation to act in good faith when it provided plaintiff daily assistance in practicing with the instruments for one whole quarter. *See Olsson,* 49 N.Y.2d at 414, 402 N.E.2d at 1153, 426 N.Y.S.2d at 251. Plaintiff's claim of lack of good faith is based upon SCO's refusal to award plaintiff his diploma in spite of his inability to pass the new requirements. This action by SCO is not an action taken in bad faith—it is simply the university exercising its right to make a necessary change in its curriculum in light of the changing practice of optometry.

Plaintiff failed to show a breach of contract by SCO. SCO's motion for a directed verdict should have been granted as to plaintiff's contract claim. Because we reach this result based on plaintiff's failure to prove the cause of action, we do not address defendant's other arguments.

For the foregoing reasons, we affirm the judgment of the District Court denying plaintiff's section 504 claim and directing a verdict in favor of defendant on plaintiff's misrepresentation claim. We, however, set aside the judgment in favor of plaintiff on his state contract claim, and reverse and remand that aspect of the case with instructions for the District Court to enter judgment for the defendant.

NATHANIEL R. JONES, Circuit Judge, concurring in part, dissenting in part.

While I concur in the result reached by the majority concerning Doherty's misrepresentation and handicap discrimination claims, I respectfully dissent from the majority's reversal of the jury verdict in favor of Doherty on his contract claim.

My dissent flows from the majority's conclusion that the district court erred in failing to direct a verdict in favor of Southern as to Doherty's breach of contract claim. Under Tennessee law, which we are required to apply to this state law claim, "[a] directed verdict should not be granted if there is *any* material evidence in the record that would support a verdict for the plaintiff...." *Dewberry v. Maddox,* 755 S.W.2d 50, 55 (Tenn.App.1988) (emphasis added). *See also Wharton Transport Co. v. Bridges,* 606 S.W.2d 521, 525–26 (Tenn. 1980). Moreover, under Tennessee law, where the student possesses a reasonable belief that a college will not change its degree requirements as to him, and where the college should reasonably have expected the student to form such a belief, the student may maintain an action for breach of contract if the degree requirements are changed to his detriment. *See Bales v. Lincoln Memorial University,* slip op. (Tenn.App., Dec. 31, 1980). *Cf. Peretti v. State of Montana,* 464 F.Supp. 784, 786 (D.Mont.1979), *rev'd on other grounds,* 661 F.2d 756 (9th Cir.1981) (stating that the university/student relationship is contrac-

tual in nature and that "[o]nly that which is reasonable may be implied" as a term of the contract).

In my view, the statements which Drs. Ebbers and Vasa made concerning Doherty's ability to complete the optometry program at Southern constitute material evidence from which a jury reasonably could find that a contract existed between Doherty and Southern, and that Southern breached that contract. Since Drs. Ebbers and Vasa repeatedly indicated that Doherty's handicap would not prevent him from completing the optometry program, the jury could reasonably have found (1) that Doherty had a reasonable belief that no clinical proficiency requirements would be applied to him, and (2) that Southern should reasonably have expected Doherty to form such a belief. Since there existed sufficient evidence under Tennessee law to find in favor of Doherty on his contract claim, I respectfully dissent from the majority's reversal of the jury's verdict.