**Amy THOMAS, by and through her mother and next friend, Janice THOMAS**

v.

**DAVIDSON ACADEMY.**

**No. 3:94–0071.**

United States District Court, M.D. Tennessee, Nashville Division.

Feb. 7, 1994.

Richard Lee Colbert, Nashville, TN, for plaintiff.

Samuel E. Wallace, Michael Edward Wallace, Randle S. Davis, Nashville, TN, for defendant.

### MEMORANDUM

JOHN T. NIXON, Chief Judge.

On February 1, 1994, the Court held a consolidated trial and hearing pursuant to Fed.R.Civ.P. 65(a)(2) on plaintiff's application for a preliminary injunction in the above-styled matter. Upon the evidence presented and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law, in accordance with Fed. R.Civ.P. 52 and 65(d).

### I. FINDINGS OF FACT

1. Plaintiff Amy Thomas is a seventeen-year-old senior at Davidson Academy. Miss Thomas has attended Davidson Academy continuously since she was in the first grade and has fulfilled her academic requirements satisfactorily. She has participated on the basketball, track, and softball teams, and was voted "wittiest" in her senior class. Her school record reflects that prior to the 1993–94 school year she sustained one disciplinary sanction, in the fall of 1992, for disrespectful behavior. She is expected to graduate at the end of the Spring 1994 semester, and plans to attend Western Kentucky University.

2. Defendant Davidson Academy is a Tennessee corporation which operates a private elementary and secondary school in Nashville, Tennessee. Davidson Academy is not affiliated with any particular church or religious organization. Davidson Academy is approved by the Tennessee Department of Education and is accredited by the Southern Association of Colleges and Schools. Davidson Academy participates in at least three

federally-funded programs.[1] In order to receive federal funds, Davidson Academy has provided written assurance that it is in compliance with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Davidson Academy sponsors out-of-state trips for its students for both educational and extracurricular activities, and provides transportation and faculty for such trips.

3. In November, 1993, Miss Thomas began experiencing severe bleeding from her cervical area and sought medical treatment. Miss Thomas was hospitalized on November 17, 1993, due to a dangerously low platelet count of only 3,000 platelets per microliter of blood. The range in a normal platelet count is between 150,000 and 400,000 platelets per microliter of blood. An individual with a platelet count of 3,000 is at risk for spontaneous hemorrhaging. During Miss Thomas' hospitalization, she was diagnosed with idiopathic thrombocytopenic purpura ["ITP"].

4. ITP is a serious autoimmune disease, affecting the hemic or blood system, wherein the immune system develops antibodies to and destroys its own platelets. A person with ITP is susceptible to life-threatening bleeding or hemorrhaging and must take great care to avoid, and promptly attend to, even seemingly minor physical traumas that are a part of daily life. ITP is not contagious.

5. During Miss Thomas' hospitalization commencing on November 17, Miss Thomas received two treatments of intravenous gamma globulin which raised her platelet count to 12,000 by the time she was released after a four-day stay. Two days after her release, however, Miss Thomas began suffering from a nose bleed. After being taken to a doctor, it was determined that Miss Thomas' platelet count had fallen to 10,000. She was readmitted to the hospital and treated with steroids and other medical therapies. When such treatments failed to control her condition, Miss Thomas underwent surgery on November 30, 1993, to remove her spleen. Ms. Thomas' spleen was removed in an effort to halt the destruction of platelets by Miss Thomas' own immune system. During this time, Miss Thomas missed several weeks of classes at Davidson Academy. She returned to school on December 8, 1993.

6. As a result of her ITP, Miss Thomas must visit her physician, pediatric hematologist Dr. James Gay, on a weekly basis to check her platelet count. She also regularly receives follow-up treatment from her surgeon. Miss Thomas must take penicillin, iron supplements, and other prescription medications to prevent routine infections, anemia, and bleeding which could result in serious injury or death. On occasion, Miss Thomas has also been required to receive additional treatments of intravenous gamma globulin.

7. On January 5, 1994, Miss Thomas visited Dr. Gay for her weekly platelet count. Although Miss Thomas' platelet count had risen to the normal range after her surgery, it was falling again and had dropped to a level below the normal range. Miss Thomas was advised and aware of her falling platelet count. In addition, Miss Thomas was again experiencing severe bleeding from her cervical area, at a time when such bleeding should not occur. Dr. Gay has reported that a person suffering from ITP can experience a rapid reduction in the platelet count overnight.

8. Davidson Academy had been informed about Miss Thomas' condition during or soon after her November, 1993, hospitalizations and surgery. According to Mr. Art Mayernick, principal of Davidson Academy, he knew and was "worried" about Miss Thomas' condition. Similarly, Mr. Bill Chaney, the headmaster at Davidson Academy, reported that he was aware that Miss Thomas had been in the hospital and had a serious medical condition. Furthermore, Mr. Chaney noted that her medical condition was "well-known."

---

1. The programs include a drug education program provided through the Drug–Free Schools and Communities Act of 1986, 20 U.S.C. § 3171 *et seq.;* and teacher training programs provided through Chapter II [the "Federal, State and Local Partnership for Educational Improvement"] of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. § 2911 *et seq.,* and the Dwight D. Eisenhower Mathematics and Science Education Act, 20 U.S.C. § 2981 *et seq.*

9. On Friday, January 7, 1994, while in art class at Davidson Academy, Miss Thomas accidentally cut herself with an exacto knife while working on an art project. Ms. Sherry Slocum, Miss Thomas' art teacher, described Miss Thomas' reaction to her injury as "hysterical," noting that she was crying and scared, and that she used two expletives. According to Ms. Slocum, Miss Thomas exclaimed, "Oh my God, I cut myself, I'm going to die."

10. After wrapping her finger in a tissue, Miss Thomas went to the school office. At the office, she saw Mrs. Becky LeGate, the Student Life Coordinator at Davidson Academy. According to Mrs. LeGate, Miss Thomas was still crying and visibly upset, and Mrs. LeGate described her reaction as "hysterical." Mrs. LeGate requested Miss Thomas' authorization to call her mother, Ms. Janice Thomas, but Miss Thomas stated that she did not want to cause her mother to become upset. Mrs. LeGate notified the school nurse, Mrs. Nancy Scott, who arrived soon after. Mrs. LeGate then left the office, after being summoned to attend to other business.

11. While extremely agitated, Miss Thomas informed Mrs. Scott that she has ITP, and tried to convey to her the severity of her condition. Mrs. Scott attempted to place a gauze bandage on Miss Thomas' finger, but Miss Thomas expressed fear that the treatment might hurt her. Although Mrs. Scott noted the absence of any significant amount of blood, Mrs. Scott determined that the wound might require stitches and that Miss Thomas needed to be seen by a physician. Nevertheless, Mrs. Scott told Miss Thomas that the cut was not so bad and that she was not going to bleed to death. According to Mrs. Scott, in her experience, "All it takes is a comment to make an excited patient more excited." However, in response to Mrs. Scott's statements about her injury, Miss Thomas became very excited and was noncooperative. In addition, Miss Thomas uttered two expletives.

12. Miss Thomas told Mrs. Scott that she wanted to call her mother, and started to leave the office to go to the pay phone in the hallway. Mrs. Scott instructed Miss Thomas to remain in the office. Miss Thomas remained in the office and called her mother from the telephone therein. Miss Thomas was extremely agitated. According to Mrs. Scott, her contact with Miss Thomas lasted about ten (10) minutes, but that she felt at her "wit's end." Mrs. Scott noted that she had never experienced anything like it.

13. While Miss Thomas used the telephone, Mrs. Scott called Mr. Art Mayernick, principal of Davidson Academy. According to Mrs. Scott, she believed Mr. Mayernick's presence might calm Miss Thomas. When Mr. Mayernick arrived, he found Miss Thomas agitated and resistant to all efforts to calm and console her. Miss Thomas was speaking to her mother, and reported to her mother that no one at school understood how badly she was hurt.

14. When Mr. Mayernick finally spoke to Miss Thomas' mother, Miss Thomas was demanding to leave the office and return to class. Given that school was already ending for the day due to weather conditions, it was decided that Miss Thomas should be released from the office to take herself home.

15. On the following Monday, January 10, 1994, Miss Thomas returned to school. Miss Thomas learned later that morning that a meeting would be held in the early afternoon with the principal, Mr. Mayernick. Miss Thomas, Mr. Mayernick, and Miss Thomas' mother attended the meeting. Mr. Mayernick expressed concern about Miss Thomas' behavior on the previous Friday, January 7, 1994. Miss Thomas and Ms. Thomas attempted to explain that Miss Thomas' was suffering from ITP, that her platelet count was falling, and that she was accordingly hysterical after she cut herself on January 7, 1994. Mr. Mayernick advised them that he did not believe Miss Thomas' ITP had any bearing on her behavior on that previous Friday. According to Mr. Mayernick, he became further concerned with Miss Thomas' attitude when she failed to express remorse at the meeting for her behavior on January 7. Mr. Mayernick indicated he was inclined to recommend that Miss Thomas withdraw from Davidson Academy at the end of the first semester of the 1993–94 year. Ms. Thomas requested that Mr. Mayernick re-

consider his decision, and he agreed to do so and contact her the following day.

16. On Tuesday, January 11, 1994, Miss Thomas went to Mr. Mayernick's office and apologized for the January 7, 1994, incident. At that time, Mr. Mayernick had already called Ms. Thomas and told her that his decision remained the same, and that Miss Thomas would not be permitted to remain at Davidson Academy after the end of the first semester of the 1993–94 school year. Miss Thomas expressed that she had not apologized sooner because she had not realized how serious the problem was. Mr. Mayernick responded that he did not believe her apology was sincere. However, after Miss Thomas pleaded with him to allow her to remain at the school and offered that she "would do anything," Mr. Mayernick offered three possible alternatives to expulsion: taking away her driving privileges, taking away any exam exemptions she had earned as a result of maintaining an A average, and taking away her privilege of participating in extracurricular activities. When Miss Thomas expressed some reservations about these alternatives, Mr. Mayernick reminded her that she had said she would do anything, and Miss Thomas accepted his alternatives. Mr. Mayernick then asked Miss Thomas if she could accept these alternatives with a good attitude, and she said she would do so. However, despite their discussion, Mr. Mayernick informed Miss Thomas that he had determined that expulsion was still the appropriate disciplinary action.

17. Davidson Academy permitted Miss Thomas to remain in school through January 26, 1994, the end of the first semester. Although Davidson Academy generally prohibits students from receiving credit for classes in which they are absent more than fifteen times, in light of Miss Thomas' medical condition Davidson Academy extended special consideration to her and allowed her to complete her Fall 1993 semester courses for credit.

18. After Mr. Mayernick advised Miss Thomas and her mother of his final decision to expel Miss Thomas, both Miss Thomas' attorney and physician wrote letters to Mr. Chaney advising him of Miss Thomas' medi- cal condition and requesting that some accommodation be made for the stress she experienced after cutting herself on January 7, 1994. On January 25, 1994, this lawsuit was filed to enjoin Davidson Academy from expelling Miss Thomas at the end of the first semester, on January 26, 1994. On January 25, 1994, Miss Thomas was again hospitalized due to a falling platelet count.

## II. CONCLUSIONS OF LAW

This action has been brought under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ["ADA"], and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ["Rehabilitation Act"]. Plaintiff seeks a preliminary injunction restraining Davidson Academy from expelling her and from retaliating against her for exercising her rights.

In considering whether to issue a preliminary injunction, the Court must consider (1) whether the plaintiff has shown a strong or substantial likelihood of success on the merits; (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to others; and (4) whether the public interest is advanced by the injunction. *International Resources v. New York Life Ins. Co.,* 950 F.2d 294, 302 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992). Moreover, the four considerations are factors which the Court must balance in reaching its conclusion. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985).

### A. *Whether Miss Thomas Has Shown A Strong Or Substantial Likelihood Of Success On The Merits*

Under the ADA, it is unlawful for a place of public accommodation to discriminate against an individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of such place of public accommodation. 42 U.S.C. § 12182(a). The Rehabilitation Act prohibits discrimination under federal grants and programs, providing that no otherwise qualified individual

with a disability shall, solely by reason of such individual's disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

■ In order to state a claim under the Rehabilitation Act, a plaintiff must demonstrate that (1) she has a "disability" as recognized under the Act; (2) she is otherwise qualified for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of her disability; and (4) the relevant program or activity is receiving federal financial assistance. *Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir.1988), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).

■ In order to establish a claim under the ADA, a plaintiff must demonstrate a similar set of elements to those the plaintiff is required to demonstrate under the Rehabilitation Act. *See E.E.O.C. v. AIC Sec. Investigation, Ltd.*, 820 F.Supp. 1060, 1064 (N.D.Ill.1993) (applying caselaw developed under the Rehabilitation Act and corresponding standards to claims arising under the ADA). Accordingly, a plaintiff must demonstrate (1) that she has a "disability" as contemplated by the Act; (2) that the defendant is subject to the requirements of the Act; and (3) that she was denied the opportunity to participate in or benefit from services or accommodations on the basis of her disability, or that defendant failed to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, and accommodations to individuals with disabilities and defendant has not demonstrated that such modifications would fundamentally alter the nature of such goods, services, or accommodations. 42 U.S.C. § 12182.

1. *Is Miss Thomas' condition a disability within the meaning of the Acts?*

■ Under the ADA, 42 U.S.C. § 12102(2), and the Rehabilitation Act, 29 U.S.C. § 706(8), a person has a disability where such person has a physical impairment

that substantially limits one or more major life activities; has a record of such impairment; or is regarded as having such impairment. A physical impairment is any physiological disorder or condition which affects any one of several body systems, including the hemic, or blood, system. 28 C.F.R. § 36.104. Major life activities include a variety of functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. *Id.* The determination of whether a person is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines. 29 C.F.R. § 1630.2(j).

Miss Thomas' ITP is a serious autoimmune disorder affecting the blood system. In addition, based on the unrefuted testimony of Dr. James Gay, the Court finds that Miss Thomas' ITP substantially limits her ability to perform many major life activities. The drops in Miss Thomas' platelet count have been unpredictable and dramatic. Indeed, shortly after the January 7, 1994, incident giving rise to this action, Miss Thomas experienced a drop in her platelet count which was substantial enough to require her to be hospitalized again. Miss Thomas has been hospitalized three times over the past two and one-half months since her diagnosis. Moreover, according to Dr. Gay, when Miss Thomas' platelet count is low, she is at risk when performing even very routine activities due to the possibility of excessive bleeding and hemorrhaging. If Miss Thomas' platelet count drops to a dangerous level, such as the level she experienced in November, 1993, Miss Thomas is also at risk for spontaneous, internal hemorrhaging which would have the potential to cause permanent damage to her ability to learn or work. Although Miss Thomas' ITP has been treated with steroids and other medications, and even surgery, her condition remains serious and requires ongoing treatment.

The Court finds that Miss Thomas' ITP is a physical impairment which substantially limits her ability to perform one or more major life activities. In addition, Miss Thomas' hospitalization on three occasions over the past two and one-half months, covering a

period of three to four weeks, as well as her on-going need to receive medication and weekly medical treatment, is sufficient to establish the severity of her affliction and a record of impairment of one or more of Miss Thomas' major life activities. *See, e.g. School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 280–81, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987), *reh'g denied,* 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987). Accordingly, based on the evidence submitted and testimony of the witnesses, and in particular on the testimony of Dr. Gay, the Court finds that Miss' Thomas is an individual with a disability and is covered by the provisions of the ADA and the Rehabilitation Act.

2. *Is Miss Thomas otherwise qualified for participation in Davidson Academy?*

■ An "otherwise qualified" person is one who is able to meet all of a program's necessary requirements in spite of such person's disability. *Doherty,* 862 F.2d at 574–75 (affirming trial court's modification of "otherwise qualified" standard established in *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)). It is undisputed that Miss Thomas is academically qualified to remain at Davidson Academy. Even though Miss Thomas missed several weeks of classes due to her hospitalizations, surgery, and medical appointments, she still maintained an A average in five of her six courses, thus exempting her from all but one of her final exams. The Court finds that Miss Thomas is otherwise qualified to remain at Davidson Academy.

3. *Is Davidson Academy subject to the requirements of the ADA or the Rehabilitation Act?*

■ Davidson Academy concedes that it is a public accommodation within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12181(7)(J), and is thus subject to the requirements of the ADA. In addition, the Court finds that Davidson Academy receives federal funds through at least three different programs, and has provided assurances as a part of its application for federal funds that it is in compliance with Section

504 of the Rehabilitation Act of 1973. Accordingly, the Court determines that Davidson Academy is subject to the requirements of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well.

4. *Is Miss Thomas being excluded from Davidson Academy solely by reason of her disability and/or has Davidson Academy failed to make reasonable accommodations for Miss Thomas' condition?*

■ Miss Thomas challenges her expulsion from Davidson Academy as an illegal exclusion based on her disability, and argues that Davidson Academy has failed to make reasonable accommodations for her condition and the accompanying stress she exhibited upon cutting herself on January 7, 1994.

■ An accommodation is generally any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal opportunities. *See* 29 C.F.R. § 1630.2(o). The Court recognizes that neither the ADA nor the Rehabilitation Act impose any requirement on educational institutions to lower or to effect substantial modifications of standards to accommodate a person with a disability. *Davis,* 442 U.S. at 413, 99 S.Ct. at 2370.

It is evident that Miss Thomas exhibited behavior on January 7, 1994, which was considered generally to be unacceptable for a Davidson Academy student. According to the testimony of Dr. Gay, an expert in the treatment of children and adolescents suffering from blood diseases, however, an exaggerated reaction to an injury by an individual with a disease such as ITP and with symptoms such as Miss Thomas was experiencing on January 7, 1994, is to be expected in an adolescent. Several witnesses reported that Miss Thomas was "hysterical" and crying, and that she expressed fear of bleeding to death.

Based upon the testimony of school officials, Dr. Gay, and Miss Thomas herself, the Court finds that Miss Thomas' reaction to cutting herself on January 7, 1994, resulted from her extreme yet understandable fear of

her injury based on her knowledge of her ITP condition. Davidson Academy has seemingly overlooked the extreme stress and fear that Miss Thomas was experiencing as a result of her ITP on January 7, 1994, in coming to its decision to expel her. Mr. Mayernick stated that he expected exactly the same attitude from Miss Thomas as from any other Davidson Academy student. The Court cautions that blind adherence to policies and standards resulting in a failure to accommodate a person with a disability is precisely what the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973 are intended to prevent.

■ The Court determines that Miss Thomas has been denied the opportunity to attend Davidson Academy on the basis of her disability. Furthermore, under the circumstances, responding with leniency to Miss Thomas' violations of the accepted norms of student conduct on January 7, 1994, was a reasonable accommodation for Davidson Academy to make. The Court finds no evidence to suggest that the incident which happened on January 7, 1994, or any subsequent misunderstandings which occurred between the school and Miss Thomas on January 10 and January 11, 1994, will recur in the future. The Court instructs Davidson Academy that, until a defendant fulfills its duty to offer a reasonable accommodation, there is no duty on a person with a disability to be cooperative in the defendant's unreasonable accommodation efforts. *Cf. Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1488–89 (10th Cir.1989) (Title VII religious accommodation), *cert. denied*, 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990).

■ The Court finds that Davidson Academy had a duty to reasonably accommodate Miss Thomas' disability in addressing the behavior which resulted from her injury on January 7, 1994. Allowing Miss Thomas to remain enrolled at Davidson Academy, or imposing one of the possible alternatives suggested by Mr. Mayernick on January 11, 1994, would be a reasonable accommodation which Davidson Academy could have made. The Court finds no proof that making such an accommodation would substantially modify existing standards at the school, result in a

destruction of order, or encourage other outbursts. The Court concludes, therefore, that Miss Thomas has shown a substantial likelihood of success on the merits.

**B. Whether irreparable harm will result without an injunction?**

The proof also shows that Miss Thomas will be irreparably harmed if a preliminary injunction is not issued. Miss Thomas is in the last semester of her senior year in high school, at a school she has attended for eleven and one-half years. It is the only school she has ever known. Although Miss Thomas seeks no monetary damages in this case, it is evident that money could not replace the personal joys and memories she would lose if unable to complete her last semester at Davidson Academy. *See Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 735 F.Supp. 753, 759 (M.D.Tenn.1990), *vacated on other grounds*, 908 F.2d 972 (6th Cir.1990) (injunction vacated on mootness grounds).

If an injunction is not granted, Miss Thomas will be forced to leave Davidson Academy and finish her last semester of high school as a stranger at a new school. She will lose the opportunity to share in the school spirit and camaraderie, the connections she has made in her extracurricular activities, and the experience of receiving her diploma at graduation alongside her friends and classmates of the last twelve years. Notably, she will lose the daily interactions with her friends and classmates at this most difficult time, as she confronts a serious medical condition. Accordingly, the Court concludes that irreparable harm will result to Miss Thomas if a preliminary injunction is not issued.

**C. Whether issuance of a preliminary injunction will result in substantial harm to others?**

It is undisputed that, prior to January 7, 1994, Miss Thomas was expected to remain enrolled at Davidson Academy and graduate at the end of the Spring 1994 semester. The Court finds that the January 7, 1994, incident, and its outgrowth, were highly irregular, and that there is no evidence suggesting that Miss Thomas will engage in such behavior in the future. Moreover, the Court de-

termines that, under the circumstances, allowing Miss Thomas to enroll at Davidson Academy is unlikely to inhibit the school's efforts to maintain order and discipline with its students in the future.

The Court concludes that issuance of a preliminary injunction will not result in substantial harm to others. The Court instructs Miss Thomas, however, that the Court will retain jurisdiction over this matter in the event that any further problems arise which are unrelated to her disability, or which can not be reasonably accommodated by Davidson Academy. The Court acknowledges that this may be a difficult and awkward situation, but also cautions Davidson Academy to refrain from searching for justifications to impose disciplinary sanctions, and thereby impermissibly to retaliate, against Miss Thomas during this Spring 1994 semester.

### D. *Whether the public interest is advanced by the injunction?*

It is the purpose of both the ADA and the Rehabilitation Act to provide a coherent framework and consistent and enforceable standards for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1) and (2); 29 U.S.C. § 701. Such discrimination may be manifested in a variety of forms, including in the form of the rigid application of rules and policies, found in this case, which operates unreasonably to exclude an otherwise qualified individual from receiving the benefits of an educational institution. The Court concludes that there is a significant public interest in eliminating discrimination against individuals with disabilities, and that such public interest is advanced by issuing an injunction against Davidson Academy.

After a careful balancing of the above-mentioned factors, the Court finds that they weigh in favor of granting a preliminary injunction.

### III. CONCLUSION

For the above-stated reasons, the Court finds that plaintiff Amy Thomas has met her burden, and the Court hereby grants Miss Thomas' application for preliminary injunction. Accordingly, a preliminary injunction

is entered prohibiting defendant Davidson Academy from enforcing the decision to expel Miss Thomas or otherwise to interfere with her continued enrollment at Davidson Academy; and prohibiting Davidson Academy and its officials and employees from retaliating, coercing, intimidating, threatening, or interfering with Miss Thomas in the exercise and enjoyment of her rights as granted under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973. The Court waives any requirement for security under Fed.R.Civ.P. 65(c). Furthermore, the Court retains jurisdiction of this case through the remainder of the 1993–94 academic calendar.

An Order consistent with the findings herein is filed contemporaneously.

### *ORDER*

On February 1, 1994, the Court held a consolidated trial and hearing pursuant to Fed.R.Civ.P. 65(a)(2) on plaintiff's application for a preliminary injunction in the above-styled matter.

Consistent with the contemporaneously-filed Memorandum, the Court hereby GRANTS Miss Thomas' application for preliminary injunction. Accordingly, a preliminary injunction is ENTERED PROHIBITING defendant Davidson Academy from enforcing the decision to expel Miss Thomas or otherwise to interfere with her continued enrollment at Davidson Academy; and PROHIBITING Davidson Academy and its officials and employees from retaliating, coercing, intimidating, threatening, or interfering with Miss Thomas in the exercise and enjoyment of her rights as granted under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973. The Court waives any requirement for security under Fed.R.Civ.P. 65(c). Furthermore, the Court retains jurisdiction of this case through the remainder of the 1993–94 academic calendar.