Jason BERCOVITCH; et al., Plaintiffs,

v.

**BALDWIN SCHOOL; et al., Defendants.**

Civil No. 97–1336(SEC).

United States District Court,
D. Puerto Rico.

April 11, 1997.

598

Nora Vargas–Acosta, Rio Piedras, for Plaintiffs.

Alfredo Fernández–Matínez, Santurce, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

In the landmark opinion of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court of the United States held that segregating children on the basis of race, even if under similar circumstances, deprived racial minorities of equal educational opportunities in contravention of the Fourteenth Amendment's Equal Protection Clause. In so ruling, the Court cogently pointed out that "[t]o separate [these children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Id.* at 494, 74 S.Ct. at 691. Although unlike the instant controversy, the *Brown* decision addressed the issue of racial segregation in public schools, we find the forgoing statement remarkably appropriate to the matter which is currently before the Court.

Plaintiff Jason Bercovitch was indefinitely suspended from Baldwin School two months ago as a result of repeated disciplinary problems. Represented by his parents, he has filed a request for preliminary injunction, declaratory judgment and attorney fees against the Baldwin School. its headmaster and its principal, for allegedly discriminating against him on the basis of his disability. Plaintiffs essentially contend that, in failing to accommodate Jason even after they learned that he had been diagnosed with Attention Deficit–Hyperactivity Disorder ("ADHD"), Oppositional Defiance Disorder ("ODD") and childhood depression, defendants violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., the Rehabilitation Act of 1973, 29 U.S.C. § 794, and local law. They thus request that Jason be immediately reinstated at Baldwin and provided with whichever reasonable accommodations are deemed necessary to treat his disability.

Beginning on March 25, 1997, the Court held a preliminary injunction hearing pursuant to Rule 65 of the Federal Rules of Civil

Procedure, which lasted one full week. On Friday, April 4, 1997, and upon carefully examining the pertinent facts, the applicable law and the arguments advanced by both parties throughout the hearing, the Court made a ruling from the bench in which it granted plaintiffs' request for a preliminary injunction. It also stated that it would prepare and file a written order the following week. Pursuant to this ruling, and in accordance with Rules 52 and 65(d) of the Federal Rules of Civil Procedure, the Court hereby makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Jason Bercovitch is an eleven year-old sixth grader at Baldwin School. He has attended Baldwin for the past seven years, since pre-kinder. But for his first semester of sixth grade, he has performed outstandingly at school, academically speaking. He has also participated in math and band-related extracurricular activities.

2. Defendant Baldwin School is an independent, non-profit, non-sectarian, English-language institution incorporated under the laws of the Commonwealth of Puerto Rico. It is also a private enterprise that affects interstate commerce, since it purchases products from the United States, it widely advertises in newspapers, the yellow pages and even the Internet, and actively solicits students. Furthermore, Baldwin participates in federally-funded programs, and is therefore subject to federal civil rights statutes such as the ones at issue in the instant proceedings.

3. Jason has had behavioral problems since he was an infant. His parents have had to seek therapy for the child since he was three years old. These behavioral problems have also led him to have disciplinary problems at Baldwin since pre-kinder. Throughout Jason's tenure at Baldwin, his parents have consistently made efforts to discuss their child's behavioral problems with the school's principals, teachers and staff. The school has always responded to these efforts with *ad hoc* accommodations which have been implemented to some degree of success. Examples of such accommodations range from sitting next to good role models, sitting Jason aside, and using charts and happy faces, to providing him with time-outs. Jason has usually responded positively to the strategies devised as a result of these parent-teacher conferences. Baldwin has not, however, ever devised a specific, consistent plan to deal with Jason's behavioral problems.

4. Jason was placed on probation on December 8, 1995, for his misconduct during his fifth grade. As a result of this action, Jason's parents requested a meeting with his teachers and treating psychologist, Dr. Ana Colón. At the meeting, held in January of 1996, the teachers, the principal, the psychologist and the parents all discussed ideas for working with Jason. Jason's father suggested that the school stress positive reinforcement because he responded well to it. After that meeting, the parents and the school arranged for monthly meetings to follow up on Jason's behavior. Jason's behavior noticeably improved shortly thereafter, as evidenced in his report card.

5. In August of 1996, however, Ms. Carmen Gil, Jason's fifth grade principal, was replaced by co-defendant, Ms. Nancy Pagan, who became his principal during the sixth grade. Ms. Pagan was not informed of the monthly meetings Jason's teachers had had with his parents during the fifth grade until later that year. Jason received various disciplinary referrals during the Fall of 1996, and was suspended twice that semester. Mrs. Pagan met with Jason's parents twice during this time, and reported all of Jason's incidents to them. She also made several concessions in dealing with Jason, adapting the usual manner in which she dealt with disciplinary problems to fit Jason's needs.

6. Jason was suspended from Baldwin School on January 15, 1997 as a result of yet another disciplinary incident. This time, Jason apparently refused to follow his teacher's orders to be quiet, and when asked to step outside, he refused, using expletives to refer to his teacher. He denied ever having said anything wrong, but later accepted that he was disrespectful. He was immediately sent to the principal's office, where Ms. Pagan and Ms. Viola Casellas, the school counselor and psychologist, pled with him to calm down. He nevertheless refused to follow

their instructions, insisted on remaining outside of the office, and kicked various objects. When asked to pick everything up, he complied, but remained visibly excited. Finally, Ms. Pagan called Dr. Austen, the school's headmaster, and when Jason saw him, he immediately calmed down and began to cry.

7. Jason's exact status at the school was not clearly established at the time he was suspended, but no return date was ever given. Dr. Austen, who had never communicated with Jason's parents prior to the child's suspension, gave Jason's mother the news. When Jason's mother pleaded with him to place him back in school because she suspected he might have ADHD and was to undergo an evaluation shortly, Austen reacted by telling her that he'd let her know about Jason's status in a few days. Five days later, Jason's parents met with Lawrence Duffy, Baldwin's compliance officer and general counsel, and reiterated their concern that Jason might have ADHD, and that a diagnosis would be forthcoming. Nevertheless, Mr. Duffy later confirmed Jason's status of indefinite suspension through a letter to Jason's parents. Jason's parents asked the school to reconsider their position, to no avail. Prior to the Court's April 4th bench ruling, Jason has not been either expelled or retained at Baldwin.

8. On February 3, 1997, Jason's psychologist diagnosed him with ADHD, ODD and childhood depression. ADHD is a treatable neurobiological disorder which affects approximately three to five percent of the school-age population in the United States. It manifests itself through the conduct or social interaction of the affected individual, and is characterized by inattention, hyperactivity and impulsiveness. Harvey C. Parker, *The ADD Hyperactivity Handbook for Schools* (2d ed.1996). A student with ADHD will openly manifest emotional problems such as anger, sadness, anxiety or disruptive behavior. Such problems will often lead these students to find themselves in trouble with authority figures, who assume that this conduct is intentional. ODD is a similar, yet more serious neurobiological disorder which is characterized by a tendency not to comply, to defy authority and to be negativistic, re-

sentful and angry. It is not uncommon for children who have ADHD to also be diagnosed with ODD. Seventy to eighty percent of children who are subjected to pharmacological treatment to control these disorders respond positively to it. Results are usually evident after one to three weeks.

9. Jason was referred to psychiatrist Richard Camino shortly after being diagnosed for pharmacological treatment. Upon examining him, Dr. Camino classified Jason as a "classic case of ADHD", who should be subjected to medication as well as intensive family psychotherapy as soon as possible. He emphasized that multi-modal treatment was crucial for Jason's therapy to be effective, but was confident that Jason would experience positive behavioral changes once this treatment was under way. He also held that the longer Jason was kept out of school, the longer it would take for things to get back to normal for him. Thus, he specifically recommended that Jason return to Baldwin and made defendants aware of his findings through a letter requesting that Jason be at least placed in math class and band practice. Baldwin did not comply with this request.

10. Jason's parents first expressed reservations about medicating their son, but are now convinced that it is safe and are ready, willing and able to administer such medication. Jason's father was also reluctant to receive parental training, but now both parents have expressed willingness to undergo such treatment. It is important to point out that Jason's parents have always had profound differences about the manner in which they believe Jason should be treated. They have also had marital problems and, for the past one and a half years, have undergone therapy to address these problems. Such a family framework is common in children who suffer from ADD. It is also important to stress that Jason's parents could not have administered him medication prior to his return to school because the proper treatment is to deal with ADHD in a child's school setting. Moreover, given the lack of public awareness about ADHD that until recently existed, it is unlikely that Jason's parents could have interpreted his behavior to be

symptomatic of ADHD, in order to seek treatment before they actually did.

11. Baldwin currently serves thirteen other students who have been diagnosed with ADD/ADHD. Twelve of them are taking medication. Baldwin's experience in serving these children has so far been positive.

## CONCLUSIONS OF LAW

■ This action has been primarily brought under Title III of the ADA and section 504 of the Rehabilitation Act. In considering whether to issue a preliminary injunction, the Court must consider (1) whether plaintiffs have demonstrated a substantial likelihood of success on the merits; (2) whether irreparable harm will ensue if the Court fails to grant an injunction; (3) whether the balancing of hardships favors the issuance of an injunction, and (4) whether the public interest will be advanced by the issuance of an injunction. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12 (1st Cir.1996); *EEOC v. Astra USA, Inc.,* 94 F.3d 738 (1st Cir.1996). We will analyze each requirement in turn.

*1. Whether plaintiffs have demonstrated a substantial likelihood of success on the merits.*

The Americans with Disabilities Act ("ADA") is a federal civil rights statute enacted in 1990 with the purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[1] Its Title III, which pertains to public accommodations and services operated by private entities, provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

The ADA further provides that the term "discriminate" includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).[2]

The Rehabilitation Act, on the other hand, prohibits discrimination by entities benefitting from federal grants and programs. It specifically provides that no otherwise qualified individual with a disability shall be excluded from participation or denied the benefits of any program or activity which receives federal financial assistance, solely because of his disability. 29 U.S.C. § 794(a). See also *Thomas v. Davidson Academy,* 846 F.Supp. 611 (M.D.Tenn.1994).

To establish a disability discrimination claim under the ADA, a plaintiff must prove three things by a preponderance of evidence: "First, that he was disabled within the meaning of the act. Second, that with or without reasonable accommodation he was able to perform the essential functions of [the] job. And third, that the employer discharged him in whole or in part because of his disability." *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996), *citing Katz v. City Metal Co., Inc.,* 87 F.3d 26, 30 (1st Cir.1996). The plaintiff need not, however, prove an intent to discriminate in order to prevail; it must only demonstrate that the conduct had

---

1. In its statement of motives, Congress noted that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). The Act was meant to prevent such isolation and segregation, when clearly unnecessary.

2. The ADA is not, however, "meant to prevent employers from taking steps to address poor performance by non-disabled employees ... 'To allow the antidiscrimination laws to be used by poorly performing employees will eventually work to the detriment of those who have a legitimate need for the protection of the laws'." *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12 (1st Cir.1997), *citing Henry v. Guest Services, Inc.,* 902 F.Supp. 245, 254 (D.D.C.1995), affd. 98 F.3d 646 (D.C. Cir.1996).

the effect of discriminating against the disabled. *Id.*[3]

■ Similarly, to establish a claim under the Rehabilitation Act, a plaintiff must demonstrate that "(1) she has a 'disability' as recognized under the Act; (2) she is otherwise qualified for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of her disability; and (4) the relevant program or activity is receiving federal financial assistance." *Thomas,* 846 F.Supp. at 617.

Under both the ADA, 42 U.S.C. § 12102(2) and the Rehabilitation Act, 29 U.S.C. § 706(8), a disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." *See also* 28 C.F.R. § 36.104. The term "physical or mental impairment" includes neurological disorders. Moreover, the term "major life activity" includes learning. *Id.* ADHD has been judicially recognized as a disability for purposes of the Americans with Disabilities Act. *J.H. v. ABC Care. Inc.,* 953 F.Supp. 675 (D.Md. 1996).

Based on the forgoing, the Court finds that Jason Bercovitch is a disabled person for purposes of the ADA and the Rehabilitation Act.

To be an "otherwise qualified" individual, a person must meet all of the defendant institution's necessary requirements for admission/retention in spite of his disability. Jason has a proven record of excellent academic achievement and a superior intelligent quotient. His parents are, and have always been, financially able to pay for his schooling at Baldwin; Jason's 1996–97 tuition has already been paid for in full. The Court thus finds that he is, but for his disability, clearly or otherwise qualified to participate in Baldwin School's education program. His conduct cannot be the measure of his qualification because his conduct is, to a significant extent, a manifestation of his disability.

Both the ADA and the Rehabilitation Act prohibit discrimination in places of public accommodation. A place of public accommodation is defined as a facility operated by a private entity, whose operations affect commerce and fall within at least one of several categories, including an "elementary, secondary, undergraduate, or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(J); 28 C.F.R. § 36.104; 29 U.S.C. § 794. This Court has already established that Baldwin's operations affect commerce and that the school receives federal assistance. Thus, it is subject to the requirements of both of these acts.

Plaintiffs need to demonstrate either that Jason was discriminated against solely by reason of his disability or that defendants failed to make reasonable accommodations for Jason's condition. An accommodation has been generally described as "any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal opportunities." 29 C.F.R., App. § 1630.2(*o*). The determination of whether the modification required under the ADA is reasonable involves a fact-specific, case by case inquiry that considers, among other factors, the effectiveness of this modification in light of the nature of the disability in question, and the cost to the organization that would implement it. *Staron v. McDonald's Corp.,* 51 F.3d 353 (2d Cir.1995).

There are, however, certain exceptions to this reasonable accommodation requirement. A "covered service provider need not, [for example], deal with an individual who 'poses a direct threat to the health or safety of others' ... The term 'direct threat' is defined by the statute; in this context, it contemplates the existence of 'a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services.'" *Abbott v. Bragdon, DMD,* 107 F.3d 934 (1st Cir.1997).

In determining whether an individual poses a direct threat to the health or safety of

---

3. Nevertheless, an institution cannot be liable for a discriminatory discharge if, at the time of the discharge, the entity has not been informed of the disability and has no reason to know of the disability. *Lippman v. Sholom Home, Inc.,* 945 F.Supp. 188 (D.Minn.1996).

others. Courts must responsibly balance the need to protect service providers and other places of accommodation from an enforced exposure to safety risks with the need to protect disabled individuals from discrimination based on prejudice or fear. *Id.*

Defendants have presented no evidence to prove that Jason's disruptive behavior rises to the level contemplated by the forgoing exception. The Court thus finds that Jason's disability is clearly not the kind that would pose a direct threat to the health or safety of others, nor would accommodating him fundamentally alter Baldwin's mission. Moreover, we find that although Jason was not originally suspended from Baldwin because of his disability, the school's decision to suspend him indefinitely was rendered even after Jason's parents warned school officials that Jason could have ADHD and would be diagnosed shortly. Baldwin thus failed to reasonably accommodate Jason upon learning about his disability, and in doing so, it failed to comply with both the Americans with Disabilities Act and the Rehabilitation Act.

More importantly, however, Baldwin's refusal to reasonably accommodate Jason by allowing him back at Baldwin with medication and treatment, and under the conditions set forth by his treating physician, leads us to conclude that plaintiffs have a high likelihood of success on the merits of this action.

### 2. Whether irreparable harm will ensue if the injunction is not granted

Jason will undoubtedly suffer an irreparable harm if he is not placed back in school as soon as possible. He is now in an educational and emotional limbo. His condition has worsened since he was suspended. Every day that goes by without treatment raises more complex issues in treating Jason. Furthermore, Baldwin is the only school he's known. Reinstatement to Baldwin would allow him an opportunity to show off his talents and raise his self esteem, as his medication begins to take effect. It would also allow him the greatest degree of consistency, in terms of his friends, classmates, professors and school staff. This is an integral part of Jason's treatment.

### 3. Whether the balancing of hardships favors plaintiffs

Baldwin would not be required to make substantial changes in its daily operations in order to accommodate Jason. The school would merely have to meet with Jason's parents and his treating physician in order to devise a written, consistent plan to deal with his disability. Neither would Baldwin be required to expend an unreasonable amount of resources to aid in his treatment. Jason's parents have already stated that they will provide Jason with the necessary medication. Moreover, re-admitting Jason would not inhibit Baldwin's efforts to maintain order and discipline at the school. Under the forgoing treatment program, Jason would not be immune from Baldwin's disciplinary rules due to his disability. The balance of hardships thus clearly favors plaintiffs in the instant action.

### 4. Whether the public interest would be advanced by the issuance of an injunction

It is evidently in the public interest to guarantee that children with disabilities such as Jason's be reasonably accommodated in the schools which they attend prior to subjecting them to specialized education. Mainstream solutions should be explored prior to specialized ones. Students with ADHD need continuance in their lives; and keeping them in regular schools raises their self esteem and makes them feel that they are "just like the rest". This is precisely the mission of the Americans with Disabilities Act: to help prevent those with disabilities from being segregated from the remaining population if, with or without a reasonable accommodation. they are able to perform the duties required of them in their place of public accommodation. 42 U.S.C. § 12101.

Upon carefully balancing all of the forgoing factors, the Court finds that they all weigh in favor of granting a preliminary injunction. We will thus proceed to do so, as instructed below. First. however, the Court will entertain two pending issues which were

addressed by the parties in the preliminary injunction hearing.

## JURISDICTIONAL CLAIMS

### 1. Arbitration Requirement

■ The parties to this action signed an enrollment contract at the beginning of the 1996–97 school year, whereby they agreed to submit any disputes arising from the contract to arbitration, pursuant to the school's by-laws. It is this particular provision which, defendants contend, precludes plaintiffs from filing an action for injunctive relief in federal court and deprives this Court of jurisdiction.

The ADA provides that, where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including arbitration, is encouraged to resolve disputes arising under this chapter. 42 U.S.C. § 12212. Nowhere does it state that such means are mandatory, or that they preclude injunctive relief.

The Arbitration Act, on the other hand, does not specifically address the issue of whether or not a preliminary injunction can be issued in an arbitrable dispute. *Teradyne Inc. v. Mostek Corp.*, 797 F.2d 43, 47 (1st Cir.1986). The First, Second, Fourth and Seventh Circuits have, however, held that a court can, and should, grant a preliminary injunction in an arbitrable dispute whenever an injunction is necessary to preserve the status quo pending arbitration. *Id.* The Seventh Circuit has stated that "the right to arbitrate and to seek injunctive relief are not incompatible, and that a plaintiff should not be obliged to abandon one in order to pursue the other." *Sauer–Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 350 (7th Cir. 1983).

The forgoing approach has been held to reinforce, rather than detract from, the policy of the Arbitration Act: "We believe that the Congressional desire to enforce arbitration agreements would frequently be frustrated if the courts were precluded from issuing preliminary injunctive relief to preserve the status quo pending arbitration and, ipso facto, the meaningfulness of the arbitration process." *Teradyne*, 797 F.2d at 51.

In the instant case, plaintiff Jason Bercovitch was indefinitely suspended from school in January of 1997. Despite the representations made by defendants' counsel as to their efforts to resolve this case extrajudicially, the fact is that they never communicated to plaintiffs their intention to find ways to accommodate Jason at Baldwin. Had Jason opted to wait until the parties and their attorneys solved the dispute without recourse to this Court, he would undoubtedly still be out of school. He would have lost the opportunity to finish his sixth grade with the rest of his class. Arbitration would have, thus, rendered his claim futile. Through the instant injunctive relief, the status quo—Jason's situation prior to the school action which provoked this request for a preliminary injunction—will be preserved, and any subsequent negotiations will not render his cause of action futile.

### 2. Exhaustion of administrative Remedies

■ Title III of the ADA provides that "[t]he remedies and procedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such a person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a).

■ Section 2000a–3(a) of the Civil Rights Act, 42 U.S.C. § 2000a–3(a), to which the ADA specifically refers, provides that "[w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a–2 of this title, a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved ..." 42 U.S.C. § 2000a–3(a).

Defendants contend that § 2000a–3(c) is also applicable to Title III of the ADA. This section requires that the affected party not file any civil action without first making a written notice to the appropriate state authority and waiting thirty days after such notice. In the event that such notice is not made prior to the civil action, the court may stay the proceeding pending termination of the enforcement proceedings.

Nowhere in Title III of the ADA, however, is specific reference to this section ever made. Given that Congress specifically referred to § 2000a–3(a) when outlining the available remedies under Title III, we believe that, had it wanted to make written notice to state authorities a requirement under this title, it would have explicitly done so. We thus conclude that Title III imposes no requirement of exhaustion of administrative remedies or right to sue letters upon plaintiffs wishing to bring an ADA claim for injunctive relief against a private entity.

Even if plaintiffs were required to exhaust administrative remedies. we note that plaintiffs did contact the local Office of the Solicitor for the Disabled ("OPPI") on January of 1997. Nevertheless, an officer encouraged them to hire a private attorney because their caseload was heavy and the administrative process unduly long. Given the immediate need that plaintiffs had for a ruling on this matter, the officer felt they would be better served by filing a private cause of action under the ADA or the Rehabilitation Act.

A case on point as to the futility of filing an administrative action prior to requesting injunctive relief in federal court is that of *Juan Pascual v. Baldwin School* (PAIR 95–341), filed at the OPPI in 1995. A ruling in favor of plaintiff was finally rendered in August of 1996, yet the order is still pending an appellate court's decision. The plaintiff in that case, a student who also alleged discrimination on the basis of his disability, was forced to enroll in a different school pending the final determination.

■ It should also be noted that, under the Rehabilitation Act, a plaintiff need not exhaust administrative remedies in seeking injunctive relief. Primary jurisdiction considerations are not a bar to declaratory and injunctive relief against a place of public accommodation that participates in federal assistance programs. *See. e.g. Doe by Doe v. Belleville Public Sch. Dist.*, 672 F.Supp. 342 (S.D.Ill.1987); *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732 (3d Cir.1983).

■ Finally, we note that the Commonwealth of Puerto Rico does not have exclusive or primary jurisdiction over the instant complaint, and therefore, plaintiffs can file a claim in federal court. *Wood v. County of Alameda*, 875 F.Supp. 659 (N.D.Cal.1995). Plaintiff is free to bring suit under both state statutes and the ADA so long as the state measures are consistent with the intent of federal law.

Based on the forgoing, the Court finds that it has jurisdiction to entertain the instant action and is not precluded from doing so either under the Arbitration Act, the Americans with Disabilities Act, the Rehabilitation Act, or local law.

### ATTORNEY FEES

■ The ADA provides that "[i]n any action ... commenced pursuant to this chapter, the court .... in its discretion, may allow the prevailing party ... a reasonable attorney's fee ..." 42 U.S.C. § 12205; 28 C.F.R. § 36.505. The Rehabilitation Act contains a similar provision providing attorney fees for the prevailing party. 29 U.S.C. § 794a(b).

A prevailing party is one who successfully establishes an entitlement to some relief on the merits of a legal claim. *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987); *Hanrahan v. Hampton*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *United States v. Bd. of Education*, 605 F.2d 573 (2d Cir.1979). The determination of whether a party has succeeded on the merits of his or her claim has been held to rest upon whether he or she has succeeded on "any significant issue in the litigation which achieved some of the benefit [he] sought in bringing the suit." *Texas State Teachers Ass'n v. Garland Ind. School Dist.* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). Recently, in *Pottgen v. Missouri State High School*, 103 F.3d 720 (8th Cir.1997), the Court held that "a plaintiff

'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.* at 723, *citing Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992).

Courts have often held plaintiffs to be prevailing parties if they succeed in obtaining a preliminary injunction order in their favor upon a finding by the Court that they had a substantial likelihood of success on the merits. *Virzi Subaru v. Subaru of New England,* 742 F.2d 677, 680–81 (1st Cir.1984); *Coalition for Basic Human Needs v. King,* 691 F.2d 597, 601 (1st Cir.1982); *Dahlem v. Bd. of Educ.,* 901 F.2d 1508, 1511–14 (10th Cir.1990). (*Cf. Pottgen v. Missouri State High School,* 103 F.3d 720 (8th Cir.1997), where plaintiff was held not to be a prevailing party after appeal was reversed).

The parties do not dispute that plaintiffs' ability to obtain attorney fees at this stage is contingent upon this Court's determination that they are prevailing parties under the Americans with Disabilities Act or the Rehabilitation Act. It is as to this latter determination that they are in disagreement. Defendants would have us believe that the preliminary injunction has not resulted in any material alteration in the relationship between the parties. They aver that Jason "was a student at Baldwin School when the Complaint was filed and he is still a student at Baldwin School as a consequence of the ... ruling on the preliminary injunction." They also contend that plaintiffs have acted with unclean hands in declining to pursue less expensive measures of dispute resolution and opting to file the instant proceeding. We disagree with both of these assertions.

First, as plaintiffs assert, Jason Bercovitch would not currently be attending Baldwin had it not been for this Court's bench ruling ordering his reinstatement. His position today is thus, materially different from that in which he was prior to the filing of this action. In second place, throughout the hearing, plaintiffs established that they pleaded with defendants to reinstate Jason on several occasions, even prior to retaining the attorneys who currently represent them, and that defendants employed one delay tactic after another so as to avoid reinstating Jason at all.

Given the forgoing facts, this Court holds that plaintiffs are entitled to reasonable attorney fees at this stage of the proceedings. Plaintiffs should submit a memorandum calculating their fees no later than Friday, April 18, 1997.

## CONCLUSION

For the forgoing reasons, the Court finds that plaintiffs have met their burden of establishing compliance with all four preliminary injunction requirements. Thus, we hereby **GRANT** plaintiffs' application for a preliminary injunction. A preliminary injunction is issued accordingly, prohibiting Baldwin from enforcing its decision to indefinitely suspend Jason. Plaintiff shall return to school and be subjected to pharmacological treatment to inhibit his disruptive classroom behavior, as per his treating physician's instructions. He will also have to be subjected to a multi-modal treatment, as per Dr. Camino's recommendations, since child and adolescent physicians agree that merely administering the drug is not enough to curb his current behavioral disability. This approach will include both individual and family psychotherapy, parenting courses and family workshops, among other measures. Jason's parents, physicians and teachers will devise a plan which identifies Jason's needs and develops strategies, such as a systematic reward program and periodical evaluations, to help Jason address his problems. His treatment should not, however, be perceived as an all-or-nothing deal. Any improvement is an advancement when it comes to ADHD. One must address treatment with reasonable expectations, such as that Jason will not be physically aggressive or continuously disrespectful to those with authority.

Although the Court is convinced of the reasonableness of the forgoing accommodations, Baldwin will not be forced to unconditionally serve Jason if accommodating him ceases to be reasonable; that is, if after a reasonable amount of time, it is determined that the prescribed treatment has failed to improve Jason's behavior in any significant

manner. This Court will thus retain jurisdiction over this matter until at least June of 1997, when a permanent injunction hearing shall be heard. At that point, the parties shall discuss Jason's response to his pharmacological and psychotherapeutic treatment so far.

It is of the utmost importance that both parties cooperate in good faith with the implementation of this order.

**SO ORDERED.**